# Exhibit

# 1

1

1        UNITED STATES BANKRUPTCY COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3              (SAN JOSE DIVISION)

4

5   In re:

6   SONIC BLUE, INC.,                    Case No. 03-51775-MM

7                                        Chapter 11

8                                        San Jose, California
                                         February 15, 2007
9                                        3:39 p.m.
            Debtor.
10   _____/

11

12

                    TRANSCRIPT OF PROCEEDINGS
13      a) MOTION FOR AUTHORITY TO DISCLOSE CONFIDENTIAL
        INFORMATION TO PEOPLE WHO ARE NOT PARTIES TO THE
14            VIA/INTEL CONFIDENTIALITY AGREEMENT BY
     OFFICIAL COMMITTEE OF CREDITORS HOLDING UNSECURED CLAIMS
15          b) RESPONSE BY VIA TECHNOLOGIES, INC.

16

17          BEFORE THE HONORABLE MARILYN MORGAN
              UNITED STATES BANKRUPTCY JUDGE

18

19   APPEARANCES:

20
     For the Creditors'          LEVENE, NEALE, BENDER, RANKIN
21   Committee:                   & BRILL, LLP
                                  BY: RON BENDER, ESQ.
22                                10250 Constellation Boulevard.
                                  Suite 1700
23                                Los Angeles, California 90067

24

25

```
 1  APPEARANCES (CONTINUED):

 2

 3  For Riverside              MURRAY & MURRAY
    Contracting:               BY: ROBERT A. FRANKLIN, ESQ.
 4                             19400 Stevens Creek Boulevard,
                               Suite 200
 5                             Cupertino, California 95014

 6

 7  For the Debtor:            PILLSBURY, WINTHROP, SHAW &
                               PITTMAN
 8                             BY: THOMAS V. LORAN, III, ESQ.
                                   ALBERT BORO, ESQ.
 9                                 WILLIAM FREEMAN, ESQ.
                               50 Fremont Street
10                             San Francisco, California 94105

11

12  For Intel Corporation:     GIBSON, DUNN & CRUTCHER, LLP
                               BY: STEVEN JAMES JOHNSON, ESQ.
13                             1881 Page Mill Road
                               Palo Alto, California 94304
14

15
    For Maxtor Corporation:    BIALSON, BERGEN & SCHWAB
16                             BY: THOMAS M. GAA, ESQ.
                               2600 El Camino Read, Suite 300
17                             Palo Alto, California 94306

18

19  For the U.S. Trustee:      OFFICE OF THE U.S. TRUSTEE
                               BY: NANETTE DUMAS, ESQ.
20                             280 South First Street #268
                               San Jose, California 95113
21

22
    Special Litigation         O'MELVENY & MYERS, LLP
23  Counsel for Debtor:        BY: MATT POWERS, ESQ.
                               Embarcadero Center West
24                             275 Battery Street, Suite 2600
                               San Francisco, California 94111
25
```

```
 1  APPEARANCES (CONTINUED):

 2  Special Litigation        SUZZANE S. UHLAND, ESQ.
    Counsel for Debtor:       (APPEARING TELEPHONICALLY)
 3

 4
    For Sonic Blue claims:    McGRANE GREENFIELD, LLP
 5                            BY: BERNARD S. GREENFIELD, ESQ.
                              40 South Market Street, 7th Floor
 6                            San Jose, California 95113

 7                                        -and-

 8                            STUTMAN, TREISTER & GLATT
                              BY: K. JOHN SHAFFER, ESQ.
 9                            1901 Avenue of the Starts,
                              12th Floor
10                            Los Angeles, California 90067

11

12  For the senior           HENNIGAN, BENNETT & DORMAN
    note holders:            BY: BRUCE BENNETT, ESQ.
13                            865 South Figueroa Street,
                              Suite 2900
14                            Los Angeles, California 90017

15

16  For Via Technologies:     HENRY KEVANE, ESQ.
                                      -and-
17                            COLLEEN BAL, ESQ.

18                            (APPEARING TELEPHONICALLY)

19
    Court Recorder:           JACKIE JARVIS
20                            UNITED STATES BANKRUPTCY COURT
                              280 South First Street
21                            San Jose, California 95113

22
    Transcription Service:    Jo McCall
23                            Electronic Court
                              Recording/Transcribing
24                            2868 E. Clifton Court
                              Gilbert, Arizona 85297
25                            Telephone: (480) 361-3790
```

4

1                        P R O C E E D I N G S

2    February 15, 2007                           3:39 p.m.

3                            ---oOo—

4              THE CLERK: All rise.

5              THE COURT: Please be seated.

6              THE CLERK: Item 1, Sonic Blue.

7              THE COURT: Your appearances, please.

8              MR. BENDER: Good afternoon, Your Honor, Ron

9    Bender of Levene, Neale, Bender, Rankin & Brill appearing

10   on behalf of the Creditors' Committee and I suppose myself.

11             MR. FRANKLIN: Robert Franklin of Murray & Murray.

12   I'm here on behalf of Riverside Contracting.

13             MR. LORAN: Good afternoon, Your Honor, Thomas

14   Loran, Pillsbury, Winthrop, Shaw & Pittman.  With me here

15   are my partners, Al Boro and Bill Freeman, appearing on

16   behalf of the Debtor.

17             MR. JOHNSON: Good afternoon, Your Honor, Steven

18   Johnson with Gibson, Dunn & Crutcher, appearing on behalf

19   of Intel Corporation.

20             MR. GAA: Good afternoon, Your Honor, Tom Gaa on

21   behalf of Maxtor Corporation, Bialson, Bergen & Schwab.

22             MS. DUMAS: Good afternoon, Your Honor, Nanette

23   Dumas for the U.S. Trustee.

24             MR. POWERS: Good afternoon, Your Honor, Matt

25   Powers of O'Melveny & Myers, special litigation counsel for

1  the Debtor.

2          MR. GREENFIELD: Bernard Greenfield for Sonic Blue

3  claims, Your Honor.

4          MR. BENNETT: Bruce Bennett, a member of Hennigan,

5  Bennett & Dorman on behalf of the senior note holders.

6  Good afternoon.

7          THE COURT: Good afternoon.

8          MR. SHAFFER: And, Your Honor, if you'll excuse me

9  for making my appearance here, John Shaffer of Stutman,

10  Treister & Glatt on behalf of Sonic Blue claims.

11          THE COURT: I see you with your crutches.

12          MR. SHAFFER: Thank you, Your Honor.

13          MR. KEVANE: And on the phone, Your Honor?

14          THE COURT: And we have telephonic appearances,

15  yes.

16          MR. KEVANE: Henry Kevane with Pachulski, Stang,

17  Ziehl, Young, Jones & Weintraub appearing for VIA

18  Technologies.

19          MS. BAL: Also on the phone, this is Colleen Bal

20  also appearing for VIA Technologies.

21          MS. UHLAND: And also on the phone, this is

22  Suzzane Uhland of O'Melveny & Myers, special litigation

23  counsel for the Debtor.

24          THE COURT: Okay.  Well, good afternoon to all of

25  you.  Before we get started, let me just say that the one

1  thought that has stuck in my mind since I started reading

2  your pleadings is that this is truly a train wreck.  I have

3  read all of the pleadings that have been filed at least

4  once, most of them twice.

5           I don't want to see any posturing today.  I don't

6  want to see any recriminations.  I expect that the Court

7  will probably not be making decisions today.  What I would

8  like to do is have a discussion among professionals about

9  how we're going to proceed on a going-forward basis.  There

10 is at least one motion for the appointment of a trustee.

11 That may or may not be the best way to proceed, I don't

12 know.  I would like your thoughts as to whether we should

13 also consider simultaneously having a motion to disqualify

14 Pillsbury.

15          Let me turn it over to you for your thoughts.

16          MR. BENDER: Your Honor, if I could just be heard

17 briefly on the motion that I actually filed because I

18 believe that it's uncontested.

19          THE COURT: Your motion is not going forward

20 because we do not know at this point who is going to be

21 conducting discovery.  Let me say also one of the things

22 that I think that the U.S. Trustee is going to have to

23 consider is whether the Committee should be reconstituted.

24          MS. DUMAS: And, Your Honor, just on the prior

25 point that you made about the motion to disqualify

1  Pillsbury, our office will be filing a motion to disqualify
2  Pillsbury, either Friday or next Tuesday, but in the very
3  near future.

4          THE COURT: Okay.  Who wants to -- do you all want
5  to recess?  Now that I've told you what I want to do today,
6  you may want to discuss that with me not present.  We can
7  take a recess or I can ask for your thoughts.

8          MR. LORAN: We're prepared to proceed, Your Honor.
9          THE COURT: Okay.  Who would like to start?  The
10  U.S. Trustee has brought a motion to appoint a trustee.
11  Let me just say that there may be some benefits in
12  proceeding in that way because you can avoid any assertions
13  of privilege.  It may be that the Court is going to take
14  very seriously a motion to disqualify Pillsbury.

15          A case that I want to bring to your attention is
16  In re Dye -- I'm sorry, In re AFI Holding, Inc; Dye versus
17  Brown, which is a Bankruptcy Appellate Panel decision.  You
18  can find it at 355 B.R. 139.  One of the good things that
19  it does is it walks through the standard in the Ninth
20  Circuit for disqualification, and we do use a totality of
21  the circumstances test now.

22          I'm going to tell you truthfully I have a hard
23  time when I review that standard imagining any set of
24  arguments that Pillsbury would use to avoid
25  disqualification.  And it may be that you all will decide

8

1  voluntarily to withdraw.

2        MR. LORAN: May I be heard on that, Your Honor?

3        THE COURT: Yes.

4        MR. LORAN: Thank you, Your Honor, for sharing

5  your preliminary thoughts about this, and I'm mindful of

6  Your Honor's admonition at the outset about the tenor of

7  this discussion, which we take very, very seriously, as

8  Your Honor I'm sure is aware.

9        I just wanted to say, Your Honor, that we have

10  not had an opportunity to put forward to Your Honor a

11  version of events that we're prepared at this moment to

12  provide.

13        THE COURT: All right.  I so understand that, and

14  that's why I'm telling you that we're not going to make any

15  decisions today.  We're just going to talk about procedures

16  that we might use.

17        MR. LORAN: Okay.  Well, I just want the Court to

18  be aware of essentially two things, and it's frivolous

19  claim heaped upon frivolous claim.  I'm not posturing,

20  but --

21        THE COURT: It may be.  I read with great interest

22  your opinion letter.  And I read the letter where you were

23  asked to indemnify, and I read your response of last week.

24  It may be a frivolous claim, nonetheless, I think that when

25  you go through the standards, it should have been

1   disclosed.  It was perhaps a potential claim undisclosed --
2   excuse me -- a potential conflict that was undisclosed; now
3   I think you are in a position of having an actual conflict,
4   undisclosed.

5           MR. LORAN: Well, we disclosed at the outset the
6   extensive work that we had done for the Debtor pre-
7   petition, including, among other things, the issuance of
8   the debentures to the senior note holders.  So we believe
9   that the disclosure of our work pre-petition was
10  sufficient.  I appreciate that this claim came in, Your
11  Honor.  We just don't -- have never thought that our
12  opinion letter could be reasonably interpreted to mean that
13  if there was a bankruptcy, that there would be no adverse
14  consequences, much less --

15          THE COURT: You know, it may not have been a
16  reasonable interpretation.  It may have only been a
17  potential conflict then.  But once you got that letter, I
18  think you had an actual conflict, and it calls into
19  question your motivation on so many things since then.

20          MR. LORAN: Okay.  Well, can I address just the
21  other point that I wanted to address, which is the
22  underlying claim about the senior indebtedness.  And, Your
23  Honor, I'll just represent to the Court as the person
24  involved in the settlement negotiations with my partner,
25  Mr. Boro, for many months, that the term that is the

1  problem for the objecting creditors in terms of their

2  strategy to try to profit from the VIA settlement and by

3  the claim at a low amount and try to make it a larger

4  claim, is --

5          THE COURT: You're getting into language that I

6  don't really find helpful.

7          MR. LORAN: Okay.  Well, excuse me.  I'm just

8  trying to say, Your Honor, that the language in the

9  settlement agreement that is the subject of discussion was

10 language that was put into the draft of the agreement and

11 finalized in the draft of the agreement months before the

12 bondholder claim came in.  Moreover, VIA, given the full

13 opportunity to consider whether or not this was senior

14 indebtedness, the negotiation all along just being the

15 amount of the general unsecured claim --

16         THE COURT: I have to interrupt.  We're really no

17 longer talking about the settlement agreement.

18         MR. LORAN: Okay.

19         THE COURT: We really have gone way beyond that in

20 the last 24 hours.

21         MR. LORAN: Okay.  Well, then, I've said what I --

22 I was trying to say what I had hoped to say, Your Honor,

23 and I'll abide the outcome of further discussion and we'll

24 hopefully have a chance to speak then before the afternoon

25 is over.

1         THE COURT: Once again, I want to talk about

2    procedures about how we're going to go forward, not about

3    who's right and who's wrong.

4         MR. BENDER: Your Honor, if I may make a

5    suggestion, and I thought your suggestion about going

6    outside was okay, but I don't know that we could reach an

7    agreement in any sort of meaningful time with this many

8    people.

9         THE COURT: Right.

10         MR. BENDER: And that's the following: at least

11   the way I had intended on proceeding with the assignment

12   that you gave me was not to view myself as anything

13   special, and I've done everything possible I thought to

14   include everybody.  The way I envision the depositions

15   proceeding, and I thought I had everybody's agreement on

16   that, that we are all there; anyone can ask whatever

17   questions they want.  The status of where I'm at right now,

18   if I can explain to the Court, because that's what I just

19   intended to have been a simple motion, is that I've

20   received documents now from four of the relevant parties

21   and I'm told -- and Mr. Kevane is on the phone, that I'll

22   be receiving the VIA documents shortly.

23         So they're as follows: I received documents from

24   Mr. Bennett that I'm told is a complete production of the

25   documents requested and I turned over to all the parties

1  all documents which were not potentially confidential, and
2  have kept, pending Your Honor's ruling, those that are.
3          I received documents from Marcus Smith, and I
4  turned over copies of all of them to all parties.  I have
5  in my office right now one full box of documents from the
6  O'Melveny firm and two full boxes of documents that I have
7  from the Pillsbury firm, which I'm told are complete
8  responses to the document production requests, and I'm told
9  by Mr. Kevane that I will be receiving a complete document
10 production request from VIA.  So what I have worked out, I
11 think to everybody's satisfaction with respect to VIA and
12 Intel is a way in which I can turn over what amounts to
13 really all relevant documents to all parties.
14         THE COURT: I think basically you're going to have
15 to put everything on hold.  I don't think we're going to be
16 going forward with discovery until we know who is going to
17 be representing the Debtor and if the Creditors' Committee
18 is reconstituted, you may no longer be representing the
19 Committee, Mr. Bender; I don't know.
20         Let me just say that I think it's unfortunate
21 that I asked you to undertake this task, that I put you in
22 a lose-lose situation, and I'm sorry for that.  The problem
23 is I think you're known by the company you keep, and the
24 people that you serve, and you're serving a Committee that
25 is now viewed as having significant conflicts.  So I think

1   that you're in the unfortunate position of not being the
2   right man for this job.

3           MR. BENDER: Your Honor, I appreciate that.  I'm
4   not sure then what you're asking us to respond to then.

5           THE COURT: Okay.  I think I'm going to talk to
6   you all about timing, how critical it is that we hear this
7   motion.  I frankly am not necessarily inclined to grant an
8   order shorting time, because I don't want to do things in a
9   knee-jerk fashion, and I think that Pillsbury deserves the
10  time to determine what kind of response to file.  I think
11  that we all ought to think through, is it best to proceed
12  as we are.  Should Pillsbury stay in place or should there
13  be a trustee?  I don't know.

14          So really we're talking about timing for a
15  hearing on that kind of a motion.  The U.S. Trustee asked
16  that I shorten time.  The reason for shortening time is, I
17  suppose, so that this case could be back on track quickly.
18  But all assets have been liquidated.  I don't know that any
19  important decisions are being made right now.  Certainly
20  creditors would like to receive money, but I don't know
21  that there's any other urgency in going forward
22  immediately, but I wanted to hear your thoughts.

23          MR. KEVANE: Your Honor, Henry Kevane for VIA.
24          THE COURT: Yes, sir.
25          MR. KEVANE: I don't believe there is any urgency

1   and since this trustee subject has just come up suddenly, I

2   think it's something that our client would like some time

3   to consider.  We're somewhat of an innocent bystander here,

4   caught up in all these events, and there may be possibly

5   less disruptive ways of dealing with the alleged conflict

6   that Pillsbury has, that may not entail the appointment of

7   a trustee and the restarting of this case.

8           THE COURT: You see, I don't know if we're talking

9   about one trustee or four trustees, and that's a serious

10  concern that I have in this case, because four trustees

11  would certainly slow down the process, and that's why it

12  may be better in the end for the estate to bring in new

13  counsel representing the Debtor.

14          MR. KEVANE: And that's something that was on my

15  mind, Your Honor, again, Henry Kevane for VIA, is that the

16  O'Melveny firm has been involved in the case, and they're

17  perfectly capable, I think, of seeing it to the end.  The

18  Plan has been drafted.  The Disclosure Statement has been

19  drafted.  At this point, there's no augmentation of assets

20  that can occur in this case.  There's only diminution.

21  There are no operations; there are no employees.  It's all

22  about wrapping this thing up, and our view, seeing this

23  happen more quickly is better, and that's why we'd like

24  some time to consider whether or not a trustee would be

25  conducive to that or whether some other less disruptive

15

1   alternative might be helpful.

2          THE COURT: Okay.  I certainly don't disagree with

3   any of the statements that you've made.  Mr. Shaffer, do

4   you wish to be heard?

5          MR. SHAFFER: Very briefly, Your Honor.  The point

6   that Mr. Kevane made is factually correct.  There are no

7   employees really, no operations.  That is the reason, in

8   our view, that a trustee is essential here, because

9   Pillsbury has essentially been acting without a client

10  through this case.  There is a single person who is the

11  responsible person, who has another job, who manages this

12  case on a part-time basis, is not an experienced

13  reorganization person and is really -- is simply a

14  carryover.  What was missing in this case, Your Honor, was

15  a client.  One of the things that keeps professionals in

16  line, in direction, is a client.

17          THE COURT: That's true.

18          MR. SHAFFER: And a trustee would be a client.  To

19  put in another law firm is just to put in another client

20  list law firm.  As I think we said in our papers, the

21  checks and balances of the Chapter 11 process are one of

22  the reasons why it's able to work, the Creditors' Committee

23  looking after what the Debtor is doing; the clients looking

24  after what the professionals are doing.  What I think we

25  had in this case was a failure of the checks and balances

1   and I think only a trustee can bring that back.

2           THE COURT: Do you think we need one trustee or

3   four?

4           MR. SHAFFER: Well, Your Honor, it may be

5   premature for that because I don't see at least at this

6   time there having been a problem with the fact that there

7   was only one counsel for the debtor in possession.  I don't

8   think that that -- at least not yet, now we may as more

9   things come out in connection with this trustee motion,

10  discover there are some conflict issues, and I know that

11  there are substantive consolidation issues.  It may be that

12  sub groups of committees -- of a committee need to be in

13  charge of those issues.  I would not immediately say that

14  four trustees are necessary, no more than anyone was saying

15  that four Pillsbury's were necessary.  But I do think one

16  trustee is essential.  I think we -- Your Honor, we weren't

17  even looking for this.

18          THE COURT: I know.

19          MR. SHAFFER: This wasn't even our issue.

20          THE COURT: Nobody was looking for this.

21          MR. SHAFFER: So, Your Honor, we would ask for the

22  appointment of a trustee, and we would ask for it on --

23  shortened notice may be too short, but we would like it to

24  be prompt.  With all of that being said, obviously the

25  Pillsbury firm is going to respond, and we would like to

1 | have an opportunity to look at that response, to
2 | potentially take discovery if people are submitting
3 | declarations.
4 |              THE COURT: Right.
5 |              MR. SHAFFER: So I do think we need to be on some
6 | reasonable amount of notice here.  Thank you, Your Honor.
7 |              THE COURT: Mr. Franklin?
8 |              MR. FRANKLIN: Your Honor, Riverside believes that
9 | one trustee should be appointed at this point.  We concur
10 | with Mr. Shaffer's comments in the sense that if indeed --
11 | in the event the trustee comes in and believes that other
12 | trustees are appropriate, we can re-address that at that
13 | point.  There didn't appear to be any objection to the
14 | substantive consolidation that was set forth in the
15 | original Plan and Disclosure Statement, and Riverside as
16 | the holder of ten million dollars in claims and as somewhat
17 | representative of that class of unsecured creditors,
18 | believes that it's really important that these creditors
19 | get paid in a timely manner.
20 |              They've been waiting for over years in this case,
21 | and it just seems to Riverside at this point that a trustee
22 | is the best way to proceed.  The trustee can proceed with
23 | the investigation and at the same time look at the Plan
24 | that's already been filed, tweak it if necessary, and then
25 | proceed with however he or she deems appropriate.  So

1   that's how Riverside sees it.

2        THE COURT: Ms. Dumas?  I don't know what the

3   position of the U.S. Trustee is.  I know you filed a motion

4   for the appointment of a trustee, but I don't know whether

5   you had considered the issue of whether, under your

6   regulations, you're able to only appoint one trustee.

7        MS. DUMAS: You know, that's a good question, Your

8   Honor, and I actually had not considered it.  I guess

9   initially I would start with one but think carefully about

10   whether there are conflicts between the estates, and this

11   is a question that sort of arose early, in the early days

12   of the case.

13        THE COURT: I just don't know whether there's any

14   flexibility within your system, and that was one of my

15   concerns.

16        MS. DUMAS: Right, because the cases haven't been

17   substantively consolidated yet.  But I'll really have to

18   think that over, but I would go ahead and say, if there

19   have to be four, then so be it.  I do think we do need

20   somebody or some person or persons to come in and take

21   over.  I was going to use the phrase "train wreck," but you

22   said it before I could, Your Honor.

23        THE COURT: We give Mr. Shaffer the credit for

24   that phrase.

25        MS. DUMAS: Yes, that's right.  And if it's --

1   whether it's one or four, we will push those people hard to
2   make sure that there's not a delay in getting money out to
3   the creditors.  We would make sure -- our office will make
4   sure this case doesn't get bogged down --

5          THE COURT: I'm just not sure if you have four
6   trustees, maybe one law firm is better, and I think -- I
7   just throw this out to you all for consideration, which way
8   you want to --

9          MS. DUMAS: We did make our motion in the
10  alternative so that if there weren't a trustee, we did move
11  for an examiner because I think it's critical that the
12  investigation continue and that it be expanded to find out
13  the details of what happened with Pillsbury.  And I'm sure
14  Pillsbury will want to put something on the record, but I
15  think there should be an independent neutral person
16  investigating what Pillsbury knew when they knew it, what
17  kind of conflicts check did they do when they got into this
18  case.

19         THE COURT: Well, that's on the assumption that
20  Pillsbury decides it wants to stay in the case.

21         You may decide that you don't want to stay in the
22  case, I don't know.  Okay.  Nobody has really thrown out a
23  date.  When would you like to hear this motion?

24         MR. LORAN: Your Honor, may I just ask, it sounds
25  as if there are going to be two motions, a motion to

1   disqualify and a motion for appointment of a trustee.

2          THE COURT: I'm not sure.  You know, I've thrown

3   that out as something for people to consider.  I think that

4   what I'm hearing from the people who have spoken is that

5   they would prefer the method of a trustee, but they don't

6   know the answer to the question of whether we would have to

7   have four trustees.

8          MR. LORAN: I thought I heard the U.S. Trustee

9   mention that she intends to file such a motion shortly, and

10  it was based on that statement that I was hopeful that we

11  could just have the scheduling of those two motions, if

12  there are two.

13         THE COURT: If there are going to be any motions,

14  I'm going to have them all put on the same date.

15         MR. LORAN: Thank you, Your Honor.

16         THE COURT: If we're talking about a trustee,

17  disqualification, or examiner, whatever we're talking

18  about, is going to be at one time.

19         MR. LORAN: Okay.  That was my only point, Your

20  Honor.  Thank you.

21         THE COURT: Okay.  So would someone like to throw

22  out a date?

23         MR. KEVANE: Your Honor, Henry Kevane again.  At

24  the risk of sounding glib, since I'm technically still on a

25  sabbatical, I would suggest a date after February 26th when

1  I return.

2          THE COURT: Okay.  I don't think you need to worry

3  about that.  I think we'll at least go after February 26th.

4          MR. KEVANE: Thank you, Your Honor.

5          THE COURT: Ms. Dumas, what date do you have in

6  mind?

7          MR. SHAFFER: Your Honor, at the risk of

8  interrupting, I'm sorry, it may make more sense since the

9  next logical step is going to be Pillsbury responding to

10  things, assuming that the trustee gets her motion on file

11  by Tuesday, so the question is, how much time would

12  Pillsbury like to respond, and then if we maybe just work

13  in that direction.

14          THE COURT: Okay Let's do that.

15          MR. LORAN: Could we have three weeks, Your Honor?

16          THE COURT: To file your response.

17          MR. LORAN: Yes, Your Honor.

18          THE COURT: So you're talking about a hearing in

19  about a month?  Is that what you all are thinking?  Let's

20  look at that and see.

21          MR. SHAFFER: That may be a little further out

22  than some of the creditors were thinking.

23          THE COURT: You know, it may be where I'm

24  comfortable though.  Mrs. McGowan, when do we -- how many

25  trials do we have in that week of March 19th?

1          THE CLERK: Okay.

2          THE COURT:  I would like to put you during the

3    week of March 19th.  Oh, Mrs. McGowan, did I cross that week

4    off for other reasons?

5          THE CLERK: Let me check.  No.

6          THE COURT: Okay.

7          THE CLERK: March 19th.

8          MR. SHAFFER: Your Honor, due to national

9    bankruptcy conference meetings, the only two days I would

10   be available that week would be the 19th and the 20th.

11         THE COURT: You know, looking at my calendar, here

12   are the choices that you all have.  We can have an all-day

13   hearing on the 12th or the 19th or the 20th.

14         MS. DUMAS: I'm going to vote for the 12th, but I'm

15   probably in the minority.

16         THE COURT: That would be my third choice.

17         MR. LORAN: Your Honor, the 19th and the 20th we

18   would prefer, and we could do either one.

19         MR. POWERS: Your Honor, I have a conflict on the

20   12th so --

21         THE COURT: Okay.

22         MR. POWERS: Your Honor, to the extent our firm is

23   going to be involved, the 19th works better for us.

24         MR. SHAFFER: I would suggest the 19th as well,

25   just in case it needs to carry over.

1           THE COURT: Okay.  So we'll set this for the 19th.

2    I'd like to start the hearing in the morning in case we

3    have to go into the afternoon.  I'd like to start it at

4    10:30.  So if anybody wants to file any motions, that is

5    going to be the Sonic Blue date for any motions.  10:30 on

6    March 19th.

7           MR. SHAFFER: And, Your Honor, working back from

8    that if we could establish deadlines for Pillsbury to file

9    and for replies to that?

10          THE COURT: Okay.  We would use our normal four

11   weeks, two weeks, and one week schedule.

12          MS. DUMAS: Your Honor, could I request the Court

13   to shorten time on my disqualification motion if I get it

14   in on Tuesday.

15          THE COURT: Yes.  That's fine.

16          MS. DUMAS: Thank you, Your Honor, because Monday

17   is a holiday.

18          THE COURT: Everyone is on notice.

19          MS. DUMAS: Okay.

20          THE COURT: Okay.  Are there any other procedural

21   aspects that we should discuss?

22          MR. SHAFFER: Your Honor, given that there are

23   documents now in the possession of Mr. Bender, although I

24   don't think his investigation as originally constituted

25   should go forward now, I would at least like to be able to

1   get those documents, first starting with the non-

2   confidential ones, which there should be no issue about

3   since they're currently in his possession now, he should

4   just distribute copies of those.

5           THE COURT: Okay.  Do you have any problems with

6   that, Mr. Bender?

7           MR. BENDER: Your Honor, that's what I was

8   attempting to address before.  I certainly don't have any

9   problem with it.  The issue is that we were not involved in

10  the litigation.  So what I need to have happen is I need

11  for somebody who understands what is or isn't confidential

12  to go through a lot of documents with me to identify them,

13  and I understand from Intel's counsel that they are not

14  interested in spending the time because they're not funded

15  by the estate, and I think Mr. Kevane feels the same way,

16  plus I don't have the VIA documents yet.  So the only

17  logical person in my mind would be Mr. Powers who --

18          THE COURT: Alternatively, Mr. Shaffer could agree

19  that he would be subject to the same confidentiality

20  agreements.  No?

21          MR. BENDER: No, because Intel won't agree with

22  that.  We've already tried.  That was -- our first goal was

23  suggesting to involve everybody as part of the protective

24  order.  Intel won't agree, so my suggestion -- I don't

25  think it would be a lot of time in terms of days -- Mr.

1   Powers tells me that he understands the issue well enough.
2   I believe that Intel has already walked through with Mr.
3   Boro what parts of the settlement agreement need to be
4   redacted, which I don't think are relevant to what the
5   investigation is, so as things stand right now, I have
6   three boxes of documents, one from O'Melveny, two from the
7   Pillsbury firm, and a relatively small pile from Mr.
8   Bennett, and I don't if Mr. Kevane could say when I'll be
9   getting the VIA documents.

10          My suggestion to the Court is that we get my
11  motion granted because I think it's unopposed, in terms of
12  how we would deal with the confidentiality issues.  And
13  it's pretty much well laid out.  As far as VIA is
14  concerned, VIA has laid out in Mr. Kevane's pleading what
15  the procedure would be, which is completely acceptable to
16  me.

17          THE COURT: Okay.  Does anyone wish to be heard on
18  this?

19          MR. POWERS: Yes, Your Honor.  Sorry, Your Honor,
20  Matt Powers from O'Melveny & Myers, special litigation
21  counsel for the Debtor.  There's actually several different
22  confidentiality problems, and I thought we had reached an
23  agreement with Mr. Bender and potentially with Intel's
24  counsel that would have addressed all of them.  And
25  actually, there are so many confidentiality orders in this

1   case that it made my head spin a little bit.  I actually

2   prepared a diagram that I'm happy to share with the Court,

3   if the Court would like.

4           THE COURT: I would love to see your diagram.  I

5   always like diagrams.

6           MR. POWERS: Your Honor, there are, as you can see

7   from the diagram, a couple of different issues.  One is the

8   protection of Intel and VIA's confidential information,

9   some of which is in the documents that we had and have

10  provided to Mr. Bender already.  The other is there's a

11  joint defense group that was formed as part of a common

12  interest privilege and there was a joint defense agreement

13  signed that allowed certain parties, the Creditors'

14  Committee, the bondholders, to communicate as they were

15  negotiating with Intel and VIA.

16          And actually I think we had come up with a

17  solution which would enable the objecting creditors to get

18  access to all this information that we've produced so far,

19  which would be to simply extend the joint defense group to

20  include them, have them treat the documents as

21  confidential, and then as long as Intel and VIA's concerns

22  are satisfied, they can have everything we've given to Mr.

23  Bender.

24          THE COURT: Was that agreeable to Intel?

25          MR. JOHNSON: Maybe.

1          THE COURT: Maybe not?

2          MR. JOHNSON: Steve Johnson on behalf of Intel.

3    There are even levels of confidentiality within the various

4    protective orders that the Court has entered, including

5    outside counsel's eyes only, and there was an extremely

6    high level of confidentiality with respect to an earlier

7    Intel/VIA settlement agreement and particularly the

8    information in that agreement.  What Intel is unclear on is

9    whether any of that would be part of the documents that are

10   proposed for collection and production to these third

11   parties, and so from Intel's point of view, what we are

12   seeking is simply an opportunity to be able to review

13   documents and redact documents before they're produced to

14   third parties that are not parties to the confidentiality

15   agreement.

16         We've worked with Mr. Boro from Pillsbury with

17   respect to their production to Mr. Bender to redact

18   documents before those were produced, but there are other

19   documents that Mr. Bender has that have not been redacted,

20   and from Intel's point of view would need to be redacted.

21         THE COURT: How much time will that take?

22         MR. JOHNSON: We at Intel have already provided

23   our comments and a settlement agreement in redacted form

24   with redactions acceptable to Intel, which has been applied

25   to all the earlier drafts of the settlement agreement, so I

 1 | think that would just need to be applied to these other
 2 | documents, and we would need to be satisfied with no other
 3 | documents in there.
 4 |         THE COURT: So you want to review what is in
 5 | there, and how much time will that take?
 6 |         MR. JOHNSON: I don't know what the volume of
 7 | documents is.
 8 |         THE COURT: I heard two boxes and a small stack.
 9 |         MR. BENDER: Three boxes, Your Honor.
10 |         THE COURT: I'm sorry, three.
11 |         MR. BORO: And, Your Honor, in our boxes there is
12 | a -- three searchable CD's that contain 15,000 pages.
13 | Those have been rendered searchable, so the review should
14 | be relatively easy, but there is a total of 19,000 pages
15 | that Pillsbury has produced.
16 |         THE CLERK: Counsel, may I have your name for the
17 | record?
18 |         MR. BORO: Yes, Al Boro.
19 |         MR. JOHNSON: From Intel's point of view, since
20 | we're not a stakeholder in any of this, I don't believe, we
21 | think it would be most appropriate if one of the firms
22 | involved in the redacting would simply review that.
23 |         THE COURT: Okay.  I want to know how much time
24 | it's going to take to do this.
25 |         MR. JOHNSON: It would take very little time for

1  us to review redacted copies.  It would take a much longer

2  time if we had to review unredacted documents and redact

3  them ourselves.

4          THE COURT: Okay.  Mr. Powers, do you have a

5  comment on this?

6          MR. POWERS: A brief comment, Your Honor.  There

7  are many, many copies of drafts of the settlement agreement

8  that were produced to Mr. Bender, at least from our firm.

9  I am also concerned that we not hand everything over to

10 Intel because I'm concerned that would waive the joint

11 defense privilege with respect to Intel.  I'm wondering if

12 there's some solution we could come up where either my firm

13 or Mr. Bender's firm could use a template document from

14 Intel that would tell us which provisions in the settlement

15 agreement they view as confidential.

16          Those provisions shouldn't be anything that the

17 objecting creditors care about, and I don't know if they've

18 actually had access to the final version of the settlement

19 agreement in any event, so they ought to be able to tell

20 what provisions those are.  We might be able to work out a

21 situation where we could review that material, not waive

22 the joint defense privilege, and then provide the redacted

23 copies consistent with Intel's redaction template to the

24 objecting creditors.

25          THE COURT: Okay.  Mr. Johnson, is that

1    acceptable?

2            MR. JOHNSON: Yes, it is, Your Honor.  In fact

3    we've provided such a template to Mr. Boro.

4            THE COURT: Okay.  So that sounds like we're on

5    our way to a solution.  Mr. Shaffer?

6            MR. SHAFFER: Your Honor, after having heard all

7    this, I think we're okay actually without seeing these

8    documents at this point.

9        (Laughter.)

10            You know, the unfortunate thing is because we

11   don't know if Pillsbury is going to be here.  We don't know

12   if the Levene Bender firm is going to be here anymore.  If

13   a trustee or a new committee counsel comes in, they're

14   going to have to do it again --

15            THE COURT: Right.

16            MR. SHAFFER:  -- because of the sensitivity

17   issues here.

18            THE COURT: Right.

19            MR. SHAFFER: And so we're just going through the

20   wheel twice.  So my suggestion -- and I say this

21   reluctantly, is that I think the investigation must end.

22   It may be that we may need to take some of our own

23   discovery with respect to the pending trustee motion and

24   the Pillsbury motion.  I'm not saying we will or we won't.

25   It's obvious we want to see their declarations and see if

1  somebody needs to be cross-examined, but in terms of the

2  current investigation, maybe everything should just be put

3  on hold.

4          What I would ask the Court to do and it should be

5  self-evident is that now that we are in a discovery type

6  mode, that everybody should be admonished of course to

7  preserve all documents so that wherever we go in this case,

8  the record will be safe.

9          THE COURT: Okay.  Is that understood by everyone?

10         ALL COUNSEL: Yes, Your Honor.

11         THE COURT: Okay.  Are there any other issues that

12  we need to discuss?  Yes, sir.

13         MR. SHAFFER: Mr. McGrane has reminded me, we had

14  noticed two of our own depositions in connection with this

15  investigation and they will be off now as a result of what

16  I said.

17         THE COURT: Ms. Dumas?

18         MS. DUMAS: Your Honor, one concern.  I spoke to

19  the acting U.S. Trustee last night about this case, and one

20  concern that she had was just what is the situation of the

21  cash in the estate.  She wanted to make sure that the cash

22  is preserved, the assets of the estate don't go anywhere

23  while we wait to see what is going to happen with the

24  trustee motion, the Pillsbury firm, et cetera.  So I would

25  request that --

1      THE COURT: I don't think that we have a problem

2    with that kind of dishonesty and I'm not concerned about

3    that.  I can understand why the acting U.S. Trustee would,

4    but I don't know that I need to remind people that they

5    have responsibility -- the Debtor, frankly, no

6    representative of the Debtor is here other than counsel,

7    and I'm not really personally concerned about that.  But

8    you've heard the acting U.S. Trustee's concern.

9      MS. DUMAS: It's in the record, so, thank you,

10   Your Honor.

11     THE COURT: Okay.  Anything further?  There's a

12   lot of talent in this room.  I hope that you will use it

13   well.  Thank you.

14     ALL COUNSEL: Thank you, Your Honor.

15     THE CLERK: All rise.

16   (Whereupon, the proceedings are concluded at 4:15

17   p.m.)

18

19

20

21

22

23

24

25

33

1

2

3

4                    CERTIFICATE OF TRANSCRIBER

5

6            I certify that the foregoing is a correct

7    transcript from the digital sound recording of the

8    proceedings in the above-entitled matter.

9

10   DATED: February 28, 2007

11

12                            By:___/s/ Jo McCall_____

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit

# 2

Entered on Docket
**March 26, 2007**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The following constitutes
the order of the court. Signed March 26, 2007

_Marilyn Morgan_
**Marilyn Morgan**
**U.S. Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:

**SONICBLUE INCORPORATED, DIAMOND MULTIMEDIA SYSTEMS, INC., REPLAYTV, INC., and SENSORY SCIENCE CORPORATION,**

Debtors.

Cases No. 03-51775, 03-51776, 03-51777, and 03-51778-MM

Chapter 11 cases
Jointly administered

**MEMORANDUM DECISION AND ORDER ON MOTION TO APPOINT A CHAPTER 11 TRUSTEE, MOTION TO CONVERT CASE, AND MOTION TO DISQUALIFY PILLSBURY WINTHROP SHAW PITTMAN LLP AND FOR DISGORGEMENT OF ATTORNEYS' FEES**

## INTRODUCTION

When claims traders entered this case and started asking hard questions, circumstances came to light that implicated at least debtor's counsel, committee counsel and certain members of the committee, and resulted in the complete breakdown of creditor confidence. The genesis of the problem arose from the pre-petition issuance of an opinion letter, undisclosed by debtor's counsel, assuring payment to certain bondholders who effectively controlled the creditors' committee. Years later, when debtor's counsel objected to these bondholders' claims because of an original issue discount approximating $43

1

MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    million, the bondholders demanded indemnification from the law firm.  The problem was compounded

2    when debtor's counsel attempted to solve its disabling conflict by "handing off" these claims objections

3    to committee counsel, who accepted the awkward assignment.  Incredibly, these same bondholders

4    somehow were also able to insert a provision in the settlement of estate litigation without disclosing that

5    it arguably may provide them with millions more in distributions, at the expense of general unsecured

6    creditors.

7        A more complete statement of the background is set forth below in the analysis of the motions

8    by the United States Trustee to disqualify Pillsbury Winthrop Shaw Pittman LLC as counsel for the

9    debtor and for disgorgement of attorneys' fees, its motion for the appointment of a chapter 11 trustee,

10   and the motion of SONICblue Claims, LLC for conversion of the case to one under chapter 7.  For the

11   reasons explained, the motion for disqualification is granted, and the court finds that the appointment

12   of a chapter 11 trustee is warranted as being in the best interests of the creditors and other interested

13   parties.

14

15                              **FACTUAL BACKGROUND**

16                              *Formation of Joint Venture*

17       SONICblue Incorporated and three operating subsidiaries, Diamond Multimedia Systems, Inc.,

18   ReplayTV, Inc., and Sensory Science Corporation (collectively, SONICblue), designed and marketed

19   consumer electronic products.  Pillsbury Winthrop Shaw Pittman LLP ("PWSP") served as

20   SONICblue's longtime general corporate and litigation counsel.  On January 3, 2001, SONICblue

21   formed S3 Graphics Co., Ltd., a joint venture with VIA Technologies, Inc., to operate SONICblue's

22   graphics chip business.  Among the assets that SONICblue contributed to the joint venture was its

23   graphics intellectual property, specifically including rights under a 1998 patent cross-license with Intel

24   Corporation.  The rights to use Intel's graphics patents were so important that the joint venture

25   agreement included a liquidated damages clause at article 5.6 entitling the joint venture and VIA each

26   to damages of up to $70 million if the joint venture were ever enjoined from using the Intel cross-

27   license.  From the inception of the joint venture, there were serious disputes, including the threat of

28   litigation, between SONICblue and VIA.  In the context of settlement proposals in 2002, the parties

                                             2

**MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   negotiated a $15 million loan from VIA to SONICblue. However, neither a settlement nor the loan were

2   consummated pre-petition.

3   <u>*Issuance of Senior Debentures and Related Opinion Letter by PWSP*</u>

4       In April 2002, SONICblue raised financing in a private placement issuance of $75 million in

5   7¾% senior secured subordinated convertible debentures. Three institutional bondholders, Portside

6   Growth & Opportunity Fund Ltd., Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd., acquired

7   the senior debentures at a discount for $62.5 million. The senior debentures were also partially secured

8   by SONICblue's interest in shares of United Microelectronic Corporation ("UMC"), a Taiwanese

9   company. Importantly, the indenture provided for the subordination of the senior debentures to certain

10  obligations at Section 4.1:

11          The payment of the principal of, premium, if any, and interest on all Debentures
12      . . . issued hereunder shall, to the extent and in the manner hereinafter set forth, be
        subordinated and subject in right of payment to the prior payment in full of all Senior
13      Indebtedness, whether outstanding at the date of this <u>Indenture</u> or thereafter incurred.

14  "Senior Indebtedness" was defined in Section 1.1 of the indenture:

15          "Senior Indebtedness" shall mean the principal of, premium, if any, interest on
16      . . . and any other payment due pursuant to any of the following, whether outstanding on
        the date of this <u>Indenture</u> or thereafter incurred or created:

17                                      *   *   *

18          (g)     All indebtedness of <u>the Company</u> due and owing to Via Technologies,
19      Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent
        thereof in any other currency of composite currency (the "Via Indebtedness");

20  Existing debentures in the amount of $100 million issued in 1996 were also subordinated to the senior

21  debentures. PWSP partner Jorge del Calvo was designated for notice purposes on the indenture on

22  behalf of SONICblue.

23      In its capacity as counsel to SONICblue, on April 22, 2002, PWSP issued to the senior

24  bondholders a written opinion as to the enforceability of the debentures. This opinion letter reads in

25  pertinent part:

26          2.      . . . Each of . . . the Purchase Agreement, the Registration Rights Agreement, the
            Indenture, the Pledge and Security Agreement and the Option Agreement, when duly
27          executed and delivered by the Buyers, will each constitute a valid and binding agreement
            of the Company, enforceable against the Company in accordance with its terms.

28

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

* * *

3.    The issuance and sale of the Debentures have been duly authorized.  Upon issuance and delivery against payment therefor in accordance with the terms of the Indenture and the Purchase Agreement, the Debentures will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms.

* * *

9.    . . . (b)   Our opinion in paragraph 2 above is subject to and limited by (i) the effect of applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally. . . .

In what may have been a scrivener's error, the bankruptcy limitation in paragraph 9 referenced only paragraph 2 and not paragraph 3 of the opinion letter.

### *Chapter 11 Filing and PWSP's Bankruptcy Rule 2014 Disclosures*

Just six months after the issuance of the senior debentures, SONICblue was unable to meet its maturing financial obligations and entered into a retainer agreement for PWSP to "represent it in its effort to restructure its obligations to certain of its existing . . . debt . . . .  The Firm's engagement will also include representation of SONICblue in . . . any case prosecuted under Title 11 of the United States Code . . . ."  PWSP partner Jorge Del Calvo was copied on the retainer letter.  SONICblue and the subsidiaries filed chapter 11 petitions on March 21, 2003.  While the cases are jointly administered, they have not been substantively consolidated.

On April 11, 2003, PWSP filed an employment application accompanied by a verified statement pursuant to Bankruptcy Rule 2014, which disclosed:

3.    The Firm has been engaged as the Debtors' corporate and litigation counsel since approximately 1989.   During that time, the Firm has provided legal representation to the Debtors in a variety of areas, including corporate and securities matters, mergers and acquisitions, litigation, and intellectual property matters.  The Firm has been working with the Debtors in connection with their restructuring since approximately October 25, 2002 when the Firm was retained to provide advice concerning the restructuring of the Debtor's liabilities and business operations.

The disclosure continued as follows:

6.    As discussed below, I, the Firm, and certain of its partners, counsel, and associates may have in the past represented, and may presently and likely in the future will represent creditors or stockholders of the Debtors in matters unrelated

4

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

to these Chapter 11 Cases.  A preliminary conflicts search performed at my direction discloses that the Firm may have represented or represents entities that are involved in some capacity with one or more of the Debtors, or may have some other relationships with these entities, in matters unrelated to the Debtors. To the best of my knowledge, the Firm's relationships with these entities is as follows. . . .

However, PWSP failed to disclose its connection resulting from the issuance of the opinion letter to the senior bondholders one year earlier.  It added, "The Firm will continue to monitor its relationship with the creditors and other parties in interest in these cases and, as it discovers additional information requiring disclosure, will promptly supplement this application with any appropriate disclosures."  The court appointed PWSP as counsel for the debtors.  Marcus Smith, the Chief Financial Officer of SONICblue, was designated its responsible individual.  PWSP diligently filed supplemental disclosures on May 30, 2003, January 23, 2004, October 27, 2004, July 13, 2005, July 27, 2005, November 4, 2005, and June 5, 2006, none of which mentioned the opinion letter.

The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors on March 21, 2003.  The court authorized the employment of Ron Bender of the law firm Levene, Neale, Bender, Rankin & Brill LLP ("LNBRB") as counsel for the committee on April 11, 2003.  As originally constituted, the committee was comprised of eight members:  Portside Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. (collectively, the "senior bondholders"), represented by Bruce Bennett of Hennigan, Bennett & Dorman, Matsushita Kotobuki Electronics Sales of America LLC and Matsushita Kotobuki Electronics Industries, A-Max Technology Co. Ltd., Manufacturers' Service Limited, and Maxtor Corporation.  In October 2003, Baltrans Logistics Inc. replaced Maxtor Corporation on the committee.  After the initial months of the case, however, only the three senior bondholders and the two Matsushita companies remained active in the cases, making the senior bondholders the majority voice on the committee.  Including the anticipated distribution collectable from the junior bondholders, the senior bondholders effectively control  approximately two-thirds of the claims in these cases.

Projecting that they would exhaust their cash reserves by April 20, 2003, the debtors immediately sought and obtained court approval of the sales of their three operating businesses, the Go Video, ReplayTV, and Rio product lines.  Thereafter, these became liquidating chapter 11 cases.

5

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   Notably, there is no functioning board of directors to whom Smith reports.  The debtor holds nearly $80

2   million in funds for distribution and anticipates receiving an additional $6 million from preference

3   settlements.  Secured claims have been paid in full from the proceeds of sale, and a distribution of 33%

4   to unsecured creditors is anticipated.

5   *Breach of Fiduciary Action in Connection with Issuance of the Senior Debentures*

6   On April 21, 2005, some of the junior bondholders filed a complaint in the Superior Court for

7   Santa Clara County against Smith and former officers and directors of SONICblue, Kenneth Potashner,

8   John Todd, Terry Holdt, Edward Esber, Robert Lee and James Schraith.  The junior bondholder

9   plaintiffs assert claims for breach of fiduciary duty and constructive fraud in connection with the

10  issuance of the senior debentures in 2002.  They assert that the defendants improperly authorized and

11  entered into the financing arrangement while SONICblue was in the zone of insolvency and hopelessly

12  unable to honor its long-term bond obligations.  They further assert that by pledging its UMC stock in

13  the transaction, SONICblue rendered a significant asset unavailable to junior bondholders in a

14  liquidation.  The defendants removed the complaint to this court on June14, 2005 on the basis that they

15  may have substantial claims for contribution and indemnification against the debtor.  That adversary

16  proceeding, Adv. No. 05-5338, remains pending, though inactive.

17  *VIA Litigation and Settlement Negotiations*

18  VIA and S3 Graphics filed duplicate proofs of claim for $70 million each on July 17, 2003 based

19  on a breach of the joint venture agreement.  They assert the breach was caused by the failure to pay

20  certain accounts payable, offering non-ordinary course discounts to accelerate the collection of

21  receivables, wrongful retention of receivables collected on behalf of the joint venture, and the failure

22  to contribute certain assets to the joint venture, and they assert they are also entitled to liquidated

23  damages if enjoined prospectively from the use of the Intel cross-license.  SONICblue objected to the

24  claims and filed an adversary complaint for affirmative relief on December 21, 2004 asserting that VIA

25  and S3 breached the joint venture agreement by failing to pay assumed obligations, that VIA breached

26  its fiduciary duty in the operations of the joint venture and the settlement of patent litigation with Intel,

27  and that S3 aided and abetted the breach of fiduciary duty.  It sought compensatory and punitive

28  damages, equitable subordination of VIA's and S3's claims, restitution, and an accounting.  PWSP

6

1    represented SONICblue in the VIA/S3 litigation.

2         SONICblue engaged in concurrent litigation with Intel Corporation concerning the termination

3    or assumption of the patent cross-license and the parties' respective rights.  This litigation was also

4    significant because termination of the license would arguably trigger the liquidated damages provision

5    of the joint venture agreement.  Because of PWSP's prior representation of Intel, the debtor retained

6    O'Melveny & Myers LLP as special litigation counsel to represent it in the dispute with Intel.

7         The various claims in the litigation with VIA and S3 and with Intel reportedly involved complex,

8    disputed facts.  The declaration of Albert Boro, a PWSP partner, sets out the following chronology

9    concerning the litigation and related settlement negotiations.  Settlement discussions between

10   SONICblue and VIA and S3 began in earnest on August 11, 2005 when the parties and their counsel

11   met to discuss a proposed structure for settlement.  Following the initial meeting, counsel for

12   SONICblue participated in conference calls with special litigation counsel, LNBRB as committee

13   counsel, and Bennett as counsel for the senior bondholders.  Based on those discussions, Boro concluded

14   that a global settlement that included Intel was necessary and that a settlement amount of less than $25

15   million would be acceptable to the committee.  Committee counsel authorized the debtor to counter with

16   a settlement offer of $6 million.  Bennett, as counsel for the senior bondholders, confirmed on August

17   30, 2005 that his clients would support a $6 million counteroffer.  Boro believed that the consent of the

18   senior bondholders to the terms of a settlement was essential to court approval.

19        On September 12, 2005, counsel for VIA sent to PWSP a draft settlement term sheet proposing

20   that VIA be allowed a general unsecured claim in the amount of $27.5 million.  In a subsequent

21   settlement meeting among counsel held on September 15, 2005, VIA and S3 reduced their settlement

22   demand to $19 million.  Bennett indicated that the senior bondholders would support a settlement of

23   only $10 million.  The debtor, through Smith, authorized a $10 million counteroffer.  It is unclear

24   whether the committee at large was consulted at this juncture or why debtor's counsel consulted only

25   Bennett.  Counsel ultimately reached a tentative agreement as to a settlement amount of $12.5 million,

26   subject to the approval of the respective clients and of creditors.  The debtor, VIA, and S3 agreed

27   immediately to the settlement amount.

28        On September 20, 2005, Bennett confirmed the senior bondholders' agreement to a $12.5 million

7

**MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

1   allowed claim, provided the settlement included, *inter alia*, that the allowed claim be neither senior nor

2   junior to other general unsecured claims.  The allowed amount of the defendants' claim appears to have

3   been fixed by September 20, 2005.  Again, the record is unclear whether the committee  participated at

4   this stage other than through the senior bondholders.  In a conference call among counsel that same day,

5   SONICblue accepted the settlement terms but requested language that the allowed claim be neither

6   senior nor junior to other general unsecured claims.   There were further discussions that the allowed

7   claim of the defendants would be a general unsecured claim, would receive an anticipated distribution

8   in the bankruptcy case of approximately 25%, and would not have priority, yet would not be

9   subordinated relative to other general unsecured claims.  Boro reports that counsel for VIA and S3

10  "posed questions about subordination of the claims of the Senior Noteholders and other creditors, and

11  expressed concern that other creditors not unduly benefit at their clients' expense, but they nevertheless

12  agreed that their [allowed] claim was neither senior nor junior to other general unsecured claims."

13       Boro's declaration reflects that at the time of the September 15, 2005 settlement meeting, he was

14  aware that the senior bondholders were subordinated to VIA Indebtedness under the terms of the

15  indenture.  His declaration also reflects that, prior to September 20, 2005, he had formed the belief that

16  the VIA Indebtedness referred only to the proposed $15 million loan to SONICblue that was never

17  made.  On September 26, 2005, counsel for SONICblue and the defendants finalized a draft of the

18  proposed settlement term sheet, which included the following provision:

19       Claimants shall jointly hold a single, allowed general unsecured claim in the Chapter 11
         case of SONICblue Inc., which claim shall be afforded the benefits and priority of
20       SONICblue's other allowed general unsecured claims and shall be neither senior nor
         junior to any other allowed general unsecured claim, in the amount of $12.5 million. .
21       . .

22  Boro sent the proposed term sheet to Bennett and to LNBRB on September 27, 2005.  In a conference

23  call held later that day, the committee approved the settlement terms.  Bender stated in a declaration that

24  this proposed term sheet was the only document concerning the settlement terms that was provided to

25  committee counsel before it received the final settlement agreement.

26       Finalizing the settlement between SONICblue, VIA, and S3 was delayed and made complicated

27  by the difficulty in reaching a resolution with Intel over the parties' respective rights under the patent

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

8

**MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

cross-license. For that reason, the initial draft of a settlement agreement was not prepared until January 25, 2006, when SONICblue's special litigation counsel, O'Melveny & Myers, circulated a draft that contained a provision dealing with VIA's allowed claim that read substantially the same as the one in the September 26, 2005 term sheet. Boro stated in his declaration that, in April or early May 2006, he and PWSP partner Thomas Loran proposed that the settlement agreement include language specifically stating that the defendants' allowed claim was not "Senior Indebtedness" under the indenture for the senior debentures. Purportedly, the reason the PWSP attorneys made the suggestion was to foreclose future litigation over the priority of VIA and S3's allowed claim. They also believed that "VIA Indebtedness" referred to the $15 million loan that was never made.

On May 12, 2006, O'Melveny & Myers circulated a revised draft of the settlement agreement with the following language added:

> Claimants and the Debtor agree that the Allowed Claim is not, and shall not be treated as, "Senior Indebtedness" under the terms of the Debtor's Indenture, dated as of April 22, 2002, for the 7-¾ Secured Senior Subordinated Convertible Debentures due 2005.

VIA agreed to the language waiving "Senior Indebtedness" status on June 1, 2006. Substantially the same language was included in a later revised draft circulated on June 16, 2006 and in the final settlement agreement.

### *Objection to Claim of Senior Bondholders*

Since substantially all assets have been liquidated, PWSP has been prosecuting avoidance actions and objections to claims. It has divided and shared the work with LNBRB, however, PWSP retained the more complex litigation or litigation requiring some knowledge of the background of the debtor's operations. PWSP initially examined the claims of the senior bondholders and the junior bondholders. It expended 49.50 hours, incurring $23,237.50 in legal fees, to complete its analysis of the senior bondholders' claims, including research on the applicability of fraudulent transfer law and usury law to the transaction. Based on its analysis, it identified a significant problem with the original issue discount granted the bondholders, the difference between the face amount and the amount actually paid for the debentures. The senior bondholders also received other consideration in the transaction, including the UMC stock, that rendered the valuation of the original issue discount more complex.

9

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   SONICblue asserts that the original issue discount constituted unamortized interest as of the petition

2   date that is subject to disallowance under Bankruptcy Code § 502(b)(2).    On July 20, 2006, PWSP

3   attorney Matthew Walker sent an email to Bennett setting forth his analysis of the original issue

4   discount and asserting that the bondholders' claim may be subject to partial disallowance under

5   § 502(b)(2) to the extent of any unmatured interest as of the petition date.  Walker's analysis showed

6   an original issue discount of $43 million. He closed with an invitation to engage in a dialogue to resolve

7   the matter short of formal litigation.

8       Bennett contacted PWSP partner Craig Barbarosh on August 24, 2006 to discuss SONICblue's

9   challenge to the bondholders' claim.  He also brought to Barbarosh's attention that PWSP had issued

10  the opinion letter to the bondholders in connection with the issuance of the debentures. Bennett asserted

11  that the bondholders had relied on the opinion letter, which they interpreted as assuring that their claims

12  were allowable in a subsequent bankruptcy case.  He further indicated that the bondholders would

13  demand that PWSP defend and indemnify them for any losses resulting from SONICblue's challenge

14  to their claim.  Bennett's  partner followed up on September 5, 2006 with a letter to the managing

15  partner of PWSP demanding indemnification from PWSP for any shortfall to which the senior

16  bondholders may be subjected as a result of SONICblue's objection to their claim.  In the letter, he

17  indicated that to the extent the bondholders are unable to recover in the bankruptcy case the full

18  principal amount of the debentures, they intended to pursue PWSP for negligent misrepresentation and

19  negligence, among other claims.

20      Barbarosh asserts in his declaration that the telephone call on August 24, 2006 was the first time

21  he became aware of the April 22, 2002 opinion letter.  PWSP immediately contacted counsel for the

22  committee, informed Bender of the bondholders' indemnification demand, and turned over to the

23  committee the task of prosecution of the objection to the claims of the senior bondholders.  On

24  September 6, 2006, it forwarded its work file containing its analysis to LNBRB.  PWSP did not,

25  however, file a supplemental Bankruptcy Rule 2014 disclosure to address the claim of the senior

26  bondholders.  When it filed its eighth interim application for compensation with the court on October

27  18, 2006, PWSP did address the analysis of and potential objection to the claim of the senior

28  bondholders. However, it simply disclosed, "The matter was turned over to the Creditors' Committee

10

MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

1    for prosecution." PWSP partner Boro asserts in his declaration that he was unaware of any potential

2    or actual claim by the senior bondholders at the time he negotiated the language concerning the priority

3    and treatment of VIA's allowed claim under the settlement between September 2005 and June 2006.

4                                    *Approval of VIA Settlement*

5            The VIA settlement agreement was filed under seal on October 10, 2006 with the debtor's

6    motion to approve the settlement. Bender asserts that LNBRB first received the settlement agreement

7    a few days before it was filed with the court. Because the settlement agreement was lengthy and

8    complex and because LNBRB had not seen any prior drafts, it requested that debtor's counsel verbally

9    walk LNBRB through the settlement agreement. In a conference call on October 4, 2006, Suzanne

10   Uhland of O'Melveny & Myers reviewed the document and the terms of the settlement agreement with

11   LNBRB partners Ron Bender and Craig Rankin. In a declaration, Bender states that there was no

12   discussion of the waiver in the settlement agreement of VIA's "Senior Indebtedness" status under the

13   indenture. He also indicated that the committee was very pleased with the settlement because it had

14   been willing to settle the litigation for $25 million. The court approved the VIA settlement on October

15   31, 2006.

16   *Joint Disclosure Statement and Plan and Disclosure of Indemnification Demand Against PWSP*

17           The debtors, in consultation with the committee, had determined for strategic reasons to defer

18   efforts in these cases to propose and confirm a plan of reorganization. The reasons included the

19   uncertainty posed by the significant claims of VIA and S3 on the confirmability of and distributions

20   under a plan, the potential rejection of the Intel cross-license at confirmation, giving rise to up to $70

21   million in liquidated damages, and the desire to substantively consolidate the estates under a plan after

22   the VIA litigation was settled. The committee assumed the lead role in preparing the joint disclosure

23   statement and plan. The initial disclosure statement filed on December 15, 2006 disclosed PWSP's

24   conflict as follows:

25           However, as a result of a conflict that has been asserted by the Senior Noteholders with
             respect to counsel to the Debtors, the Creditors' Committee is now in charge of analyzing
26           the Senior Notes Claims.

27           Upon the objection of creditors Riverside Contracting, LLC and Riverside Claims, LLC, the

28   disclosure statement was amended on January 18, 2007, elaborating on the description of the conflict

---

11

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   as follows:

2       [U]ntil recently, counsel to the Debtors was in charge of analyzing the Senior Notes
3       Claims. As a result of the Senior Noteholders' contention that counsel to the Debtors
        had pre-petition issued to the Senior Noteholders an unqualified legal opinion that the
        Senior Notes were enforceable against the Debtors in accordance with their terms,
4       counsel to the Debtors requested the Creditors' Committee to assume the role of
        analyzing the Senior Notes Claims.
5

6   Neither the first amended disclosure statement nor the prior version disclosed that the senior

7   bondholders are members of the creditors' committee, which has been charged with objecting to the

8   bondholders' claims. They also failed to disclose that Smith, who would continue to serve as Chief

9   Financial Officer and Responsible Individual, was a defendant in the junior bondholders' litigation.

10      On January 22, 2007, creditors Riverside Contracting, LLC, Riverside Claims, LLC, and Argo

11  Partners, Inc. objected to the first amended disclosure statement, raising for the first time before the

12  court the waiver in the VIA settlement agreement of the "Senior Indebtedness" status to which the VIA

13  allowed claim was arguably entitled pursuant to the senior indenture. The objecting creditors asserted

14  that the waiver effectively diluted the distribution to unsecured creditors because VIA otherwise would

15  have accepted an allowed claim in a lower amount. SONICblue Claims LLC ("SB Claims") is a claims

16  trader that has acquired at least $160,000 of the claims in this case and is the successor in interest to

17  Argo Partners. It admittedly has been interested in acquiring the VIA claim since 2006 to profit from

18  the "Senior Indebtedness" provision of the indenture.

19      Bender states that the committee first learned of the issue from the objections to the disclosure

20  statement. He, at least, had previously been unaware of the connection between the waiver of status in

21  the VIA settlement agreement and the "Senior Indebtedness" provision in the senior indenture. With

22  respect to the committee's involvement in the negotiation of the VIA settlement, Bender explained to

23  the court at the disclosure statement hearing on January 23, 2007:

24      The Creditors' Committee was not a party to that litigation. And there were so many
        complicated confidentiality agreements that the Committee wasn't even privy to the top-
25      level of confidentiality. So all I would do and Mr. Rankin would do is we would
        periodically call primarily the O'Melveny lawyers . . . to get updates from her. . . . We
26      saw that as our limited role, which is why our fees with respect to that litigation are
        minuscule compared to the fee in the case. . . . [T]he Committee . . . was essentially a
27      client – we were advised that really we were likely to lose on at least the $70 million
        part."
28

─────────────────────────────────────────────

12

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

1    This statement appears to be consistent with Bender's declaration in opposition to the motions

2  presently before the court:

3       While counsel to the Debtors (primarily Ms. Uhland of OMM) would periodically
        provide general status reports to LNBRB (primarily to Mr. Rankin and Ms. Wells who
4       were the partners at LNBRB principally in charge of dealing with the VIA/S3/Intel
        litigation) and communicate with LNBRB, and did obtain the authority of the Committee
5       (whose active participants at that time were the three Senior Noteholders and the two
        Matsushita entities) to settle with VIA/S3 by giving them an allowed general unsecured
6       claim of not more than $25 million, to the best of my knowledge, LNBRB was not a
        party to any of the confidential settlement discussions that ensued, and LNBRB was not
7       provided with any drafts of the actual VIA/S3 settlement agreement.

8       However, this characterization appears markedly at odds with the following statement in the

9  Seventh Interim Application of LNBRB for Approval of Fees and Reimbursement of Expenses filed

10 October 18, 2006: "LNBRB played a material role in negotiating and documenting the settlement."

11 LNBRB has also requested that the court approve $102,027.50 in legal fees incurred for services in

12 connection with the VIA litigation.

13      More than six months after the senior bondholders first asserted their claims against PWSP, and

14 only after the United States Trustee filed the motion for disqualification, PWSP filed a supplemental

15 Bankruptcy Rule 2014 disclosure on March 5, 2007 that states:

16      Portside Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel
        Equity Fund Ltd. (collectively, the "Senior Noteholders"), are holders of the 7¾% Senior
17      Secured Subordinated Convertible Debentures due 2005 (the "Senior Notes"). The
        Debtors scheduled the claim of the Senior Noteholders for in excess of $77 million, and
18      each of the three Senior Noteholders filed its own proofs of claim in unspecified amounts
        related to the Senior Notes. In connection with its Application, the Firm previously
19      disclosed its substantial pre-petition representation of the Debtors, including for
        corporate and securities matters. As part of that representation, the Firm represented
20      SONICblue in issuing the Senior Notes. As is typical in such financing transactions, the
        Firm issued a legal opinion to the Senior Noteholders. Pursuant to letter dated
21      September 5, 2006, counsel to the Senior Noteholders sought indemnity from the Firm
        related to the Senior Notes (the "Demand"). The Firm has rejected the Demand and
22      declined to provide any indemnity to the Senior Noteholders, and immediately upon
        receipt of the Demand the Firm informed counsel for the Creditors' Committee of the
23      Demand and turned over the analysis of all issues regarding the allowance of the Senior
        Noteholders' claims to the Committee. No lawyer in the firm who handled the financing
24      transaction was involved in the firm's analysis regarding the Senior Noteholders' claims.
        Whether the Demand creates any disabling conflict or renders the Firm not
25      "disinterested" is presently before the Court on motions filed by the U.S. Trustee.

26 PWSP submits that its failure to file this supplemental disclosure earlier was inadvertent.

27

28

13

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1

## LEGAL DISCUSSION

2

3   **I.    The Best Interests of Creditors Mandate the Disqualification of PWSP from its Representation in the Case and the Appointment of a Chapter 11 Trustee.**

4

5   Under § 327(a) of the Bankruptcy Code, a debtor in possession may employ attorneys that do

6   not hold an interest adverse to the estate and that are disinterested persons. Thus, to serve as debtor's

7   counsel, counsel must be free of all conflicting interests that might impair the impartiality and neutral

8   judgment that they are expected to exercise. *In re Bellevue Place Associates,* 171 B.R. 615, 626 (N.D.

9   Ill. 1994). "Conflicting loyalties produce inadequate representation, which threatens the interests of the

10  debtor, the trustee and the creditors, and compromises the ability of courts to mete out justice." *In re*

11  *Tevis*, 347 B.R. 679, 689 (9th Cir. B.A.P. 2006)(discussing California state law to define "adverse

12  interest" under § 327(a)). *See also In re Wheatfield Business Park LLC*, 286 B.R. 412, 417-418 (Bankr.

13  C.D. Cal. 2002). The presence of an actual conflict of interest renders counsel ineligible and constitutes

14  grounds for disqualification from further service. *See In re Plaza Hotel Corp.*, 111 B.R. 882, 889-91

15  (Bankr. E.D. Cal.)(chapter 11 debtor's counsel disqualified for failing to disclose dual representation

16  of the debtor and of debtor's owner/guarantors), *aff'd*, 123 B.R. 466 (9th Cir. B.A.P. 1990). Section

17  1104(a)(2) of the Bankruptcy Code creates a flexible standard for appointing a trustee when it is in "the

18  interests of the creditors, equity security holders, and other interests of the estate." *In re Sharon Steel*

19  *Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989). It requires the court to weigh competing interests and, under

20  appropriate circumstances, to appoint a trustee regardless of whether "cause" exists within the meaning

21  of § 1104(a)(1). *Id.* Although the United States Trustee has moved for the appointment of a trustee both

22  for cause under § 1104(a)(1) and in the best interests of creditors under § 1104(a)(2), it need only prove

23  one of these two statutory bases. *Id.*

24  The undisputed facts establish that in April 2002, PWSP issued an opinion letter to SONICblue's

25  senior bondholders. Six months later, SONICblue retained PWSP as its bankruptcy counsel. In March

26  2003, when SONICblue filed its chapter 11 petition, PWSP submitted its statement pursuant to Fed.

27  R. Bankr. P. 2014 to disclose its connections to "the debtor, creditors and any other interested parties."

28  The statement did not note any connection with the senior bondholders. Aware of its ongoing duty to

---

14

MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

1    disclose any conflicts and connections, PWSP filed seven supplemental Rule 2014 disclosure statements

2    through June 2006.  None of these supplemental statements mentioned the 2002 opinion letter or any

3    other connection between PWSP and the three senior bondholders.  Then, in late August 2006, the three

4    senior bondholders demanded indemnification from PWSP based on the 2002 opinion letter in the event

5    that objections to the bondholders' claims resulted in any losses to the bondholders.  This verbal demand

6    was followed with a written demand on September 5, 2006.  The next day PWSP transferred its files

7    concerning SONICblue's objections to the bondholders' claims to LNBRB.  Six months later, on March

8    5, 2007, after the United States Trustee had filed motions both to appoint a trustee and to disqualify

9    PWSP, PWSP filed its eighth supplemental Rule 2014 disclosure statement that provided a detailed

10   explanation of PWSP's conflict of interest with the senior bondholders.

11        From these facts it is clear that PWSP knew it had a continuing duty to update its Rule 2014

12   disclosures upon learning of any undisclosed connections or conflicts.  It is also apparent that as of late

13   August 2006, PWSP knew it had a disabling conflict of interest because it immediately sought the aid

14   of LNBRB in an attempt to resolve the conflict.  Yet, PWSP failed to apprise the court of these facts.

15   PWSP's attempt to characterize its failure as inadvertent oversight rings hollow in the face of its

16   previous history of supplemental disclosures.  PWSP argued in court that the partner in charge

17   "assumed" a supplemental disclosure had been made, but the firm has not offered any evidentiary

18   foundation for that assumption.  The declaration of PWSP partner William Freeman indicates that

19   Freeman had signed several of the earlier supplements and that he typically delegated responsibility for

20   drafting the disclosures.  There is no indication, however, that Freeman or any other PWSP partner

21   undertook responsibility, or asked someone else to assume responsibility, for preparing a supplemental

22   disclosure when the actual conflict of interest concerning the senior bondholders arose.  PWSP has

23   neither offered proof of any time spent drafting the disclosure nor produced a draft of a disclosure that

24   the firm somehow failed to file.  In the end, however, whether intentional or inadvertent, PWSP's failure

25   to disclose this significant and disabling conflict in any reasonable fashion mandates immediate

26   disqualification of PWSP from its representation in this case.  Estate professionals must make full,

27   candid and complete disclosures of all facts affecting their eligibility for employment.  *In re Plaza Hotel*

28   *Corp.*, 111 B.R. at 883, *aff'd*, 123 B.R. 466 (9th Cir. B.A.P. 1990).  *See also Neben & Starrett, Inc. v.*

15

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  *Chartwell Financial Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 881 (9th Cir. 1995), *cert. denied*, 516

2  U.S. 1049 (1996)(affirming denial of all fees after debtor's counsel failed to fully disclose circumstances

3  surrounding payment of firm's retainer).  The Rule 2014 disclosure requirements are strictly enforced.

4  *Park-Helena*, 63 F.3d at 881-82.  Negligent omissions do not excuse failures to disclose.  *Plaza Hotel*,

5  111 B.R. at 883.  Although PWSP has offered its future service in some more limited capacity, it would

6  not be helpful because the firm's motives in this case would remain subject to attack.

7           The entirety of the undisputed facts also provides clear and convincing evidence that the

8  appointment of a chapter 11 trustee is necessary to restore creditor confidence in the bankruptcy system

9  and to assure that there is no lingering taint from PWSP's representation of the debtor.  Neither the court

10  nor the creditors may ever learn why PWSP or Smith, as debtor's responsible individual, failed to bring

11  PWSP's conflict to the court's attention.  But, that unanswered question is less important with the

12  appointment of a strong, neutral trustee, who has no connections to any interested party.

13           The presence of a trustee will also alleviate any doubts regarding Smith's role as SONICblue's

14  responsible individual.  Both the United States Trustee and SB Claims have questioned whether Smith

15  has relinquished his management responsibilities to PWSP.  As the United States Trustee pointed out,

16  Smith's services are part-time at best and SONICblue has no Board of Directors to whom Smith is

17  required to report.  Additionally, it is troubling that the Disclosure Statement filed with the court failed

18  to divulge that Smith is a defendant in a lawsuit by SONICblue's junior bondholders that alleges that

19  Smith and SONICblues' former officer and directors breached their fiduciary duties to the company

20  when they authorized the issuance of the senior debentures in 2002.  In light of these substantial

21  concerns, the appointment of a trustee is warranted.

22  **II.     It is Not in the Best Interest of Creditors to Convert This Case to Chapter 7.**

23           SB Claims has asserted that conversion to chapter 7 is preferable to the appointment of a chapter

24  11 trustee.  Althoughs SB Claims relies on several justifications for conversion, in the court's view, the

25  primary reason to convert would be to remove the influence of the creditors' committee from this case.

26  The committee and LNBRB in its filings with the court, support as its "first choice" the retention of

27  PWSP as debtor's counsel while an examiner reviews the pending allegations.  Because the facts

28  indicate at least the appearance of impropriety by the committee and LNBRB, SB Claims's concerns

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    in this regard are substantial.

2          During the past year and a half, SONICblue's litigation against VIA and S3 has been the main

3    roadblock to the proposal of a plan and the conclusion of this case. The three senior bondholders were

4    actively represented in the settlement negotiations by Bennett. At the same time, these same senior

5    bondholders were both members and an effective majority of the committee. As committee members,

6    the senior bondholders were and are fiduciaries that bear a duty of undivided loyalty to provide impartial

7    service in the interests of the creditors that they represent. *In re Caldor, Inc.*, 193 BR 165, 169 (Bankr.

8    S.D.N.Y. 1996)*; In re Microboard Processing, Inc.*, 95 B.R. 283, 284 (Bankr. D. Conn 1989); *In re*

9    *Mesta Machine Co*, 67 B.R. 151, 156 (Bankr. W.D. Pa. 1986). Because the bondholders appear to have

10   used their position on the committee to insert themselves into the settlement negotiations without

11   revealing a hidden agenda, they may have breached their fiduciary duty to the unsecured creditor body.

12   Whether their motive was simply to save litigation costs for the estate by avoiding future litigation over

13   the priority of VIA's claim, or, instead, to assure a larger return on their individual investments is not

14   known. In fact, as Bennett noted, he had never personally appeared in court until March 19, 2007.

15   During the four years of this case, he has operated in the shadows and, until January 23, 2007, it was

16   not generally known to this court or the creditor body that the three senior bondholders were serving

17   on the committee.

18         SB Claims also expresses concern that LNBRB may have failed to fulfill its role as a watchdog

19   on behalf of the unsecured creditors. First, it appears that LNBRB failed to independently review the

20   settlement agreement between VIA and SONICblue. Although LNBRB asserted in its fee application

21   that it was "intimately" involved in the VIA settlement, in court it has acknowledged that it was

22   essentially a "client" with respect to the settlement negotiations. Similarly, in his declaration on these

23   motions, Bender states that LNBRB received the VIA settlement agreement after it was a "done deal."

24   Rather than review the lengthy document with fresh eyes, Bender called upon O'Melveny & Myers,

25   SONICblue's special litigation counsel, to verbally walk through the settlement's main points. Second,

26   when the actual conflict arose between PWSP and the senior bondholders, SB Claims points out that

27   LNBRB accepted responsibility for prosecuting the objections to the bondholders' claims without

28   considering its own connections to the bondholders and the fact, or at least appearance, that it might also

                                                17

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

be conflicted.  Professionals retained by an official committee of unsecured creditors owe fiduciary duties to the committee and its constituency.  *Caldor*, 193 B.R. at 170; *Matter of Celotex Corp.*, 123 B.R. 917, 920 (M.D. Fla. 1991);  *Mesta Machine Co*, 67 B.R. at 156.  This includes an obligation to represent fairly the interest of the entire creditor class, not just the committee members.  *In re General Homes Corp.*, 181 B.R. 870 (Bankr. S.D. Tex. 1994); *In re EBP, Inc.*, 171 B. R. 601 (Bankr. N.D. Ohio 1994); *Mesta Machine Co*, 67 B.R. at 156; *Pension Benefit Guaranty Corporation v. Pincus, Verlin, Hahn Reich & Goldstein Professional Corp.*, 42 B.R. 960,  (E.D. Pa. 1984).  It is not clear at this juncture whether LNBRB's handling of the objections of the bondholders was an actual conflict of interest, however, it is worth noting that under § 328(c), unless adequate disclosure is made and prior approval of the court is obtained, committee counsel can be denied compensation if at any time during the representation counsel is not a disinterested person.  *Mesta Machine*, 67 B.R. at 157-158.  No disclosures were made and no court approval was obtained with respect to LNBRB's acceptance of the claims objections referred from PWSP.  Finally, SB Claims suggests, and the record does not dispel, the belief that LNBRB's conduct was a self-interested act to protect its referral sources.  A committee controlled by the three senior bondholders hired LNBRB and, of course, has the continuing ability to fire LNBRB. If not an actual conflict, these facts certainly raise questions regarding LNBRB's suitability to vigorously pursue the claims objections on behalf of the estate.  Moreover, the protective atmosphere surrounding this close-knit referral circle is reminiscent of the "opprobrious" bankruptcy ring and the cronyism that Congress decried in the legislative history of the Bankruptcy Reform Act of 1978.  H. Rep. No. 95-595, at 6011 (Sept. 8, 1977).

The fact that counsel for claims traders flagged the concerns over potential improprieties or that the claims traders' may be acting in their own self-interest does not detract from the troublesome nature of their arguments.  Nevertheless, these very significant concerns are outweighed in this case by the need for the appointment of a strong and disinterested trustee.

There have been serious allegations that the case is being run by and for the benefit of counsel.  As a result, an active trustee who will formulate an independent strategy and direct its own counsel is critical.  It is important to this court that the United State Trustee can tap into a large pool of possible trustees by conducting a nationwide search.  In this way, the United States Trustee will have a far

18

greater opportunity to locate a strong trustee with the appropriate qualifications and without connections to this case and this legal community. Additionally, if the case remains in chapter 11, the Bankruptcy Rules require, as a safeguard, that the United States Trustee's application for an order approving either the appointment or the election of a trustee must include a disclosure of all the proposed trustee's connections to the debtor, creditors and other parties in interest. Fed. R. Bankr. P. Rule 2007.1(c). There is no similar disclosure requirement in chapter 7.

### CONCLUSION

After careful review of the evidence, consideration of both oral and written argument, the court concludes that the United States Trustee has satisfied its burden of establishing that PWSP must be disqualified from its representation in this case and that the appointment of a chapter 11 trustee is in the best interests of "creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2). The issue of disgorgement of fees is reserved for a later hearing after review by the appointed trustee.

Good cause appearing, IT IS SO ORDERED.

**\* \* \* END OF ORDER \* \* \***

**UNITED STATES BANKRUPTCY COURT**
**For The Northern District Of California**

19

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

Case No. 03-51775-MM

### SERVICE LIST

CRAIG A BARBAROSH
PILLSBURY WINTHROP LLP
650 TOWN CENTER DRIVE 7TH FLOOR
COSTA MESA CA 92626-7122

SUZZANNE S UHLAND
O'MELVENY & MYERS LLP
EMBARCADERO CANTER WEST
275 BATTERY STREET
SAN FRANCISCO CA 94111-3305

RON BENDER
LEVENE NEALE BENDER RANKIN &
BRILL LLP
1801 AVENUE OF THE STARS STE 1120
LOS ANGELES CA 90067

NANETTE DUMAS
OFFICE OF THE UNITED STATES
TRUSTEE
280 SOUTH FIRST ST SUITE 268
SAN JOSE CA 95113-0002

K JOHN SHAFFER
STUTMAN TRIESTER & GLATT PC
1901 AVENUE OF THE STARS 12TH FL
LOS ANGELES CA 90067

HENRY KEVANE
PACHULSKI STANG ZIEHL YOUNG
JONES & WEINTRAUB LLP
150 CALIFORNIA STREET 15TH FLOOR
SAN FRANCISCO CA 94111-4500

BRUCE BENNETT
HENNIGAN BENNETT & DORMAN LLP
865 SOUTH FIGUEROA ST SUITE 2900
LOS ANGELES CA 90017

BERNARD BURK
HOWARD RICE NEMEROVSKI CANADY
FALK & RABKIN
3 EMBARCADERO CENTER 7TH FLOOR
SAN FRANCISCO CA 94111-4024

PATRICK M COSTELLO
BIALSON BERGEN & SCHWAB
2600 EL CAMINO REAL SUITE 300
PALO ALTO CA 94306

ROBERT A FRANKLIN
MURRAY & MURRAY
19400 STEVENS CREEK BLVD SUITE 200
CUPERTINO CA 95014-2548

WILLIAM MCGRANE
BERNARD S GREENFIELD
MCGRANE & GREENFIELD LLP
ONE FERRY BUILDING SUITE 220
SAN FRANCISCO CA 94111

SCOTT MCNUTT
MCNUTT & LITTENEKER LLP
188 THE EMBARCADERO SUITE 800
SAN FRANCISCO CA 94105

RICHARD A ROGAN
JEFFER MANGELS BUTLER &
MARMARO LLP
TWO EMBARCADERO CENTER 5TH FL
SAN FRANCISCO CA 94111-3824

MEMO.  DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

# Exhibit

# 3

1   EDWINA E. DOWELL, #149059
    Assistant U.S. Trustee
2   NANETTE DUMAS, #148261
    SHANNON L. MOUNGER-LUM, #208071
3   Office of the United States Trustee
    280 S. First Street, Suite 268
4   San Jose, CA 95113-0002
    Telephone:  (408) 535-5525
5   Fax:         (408) 535-5532

6   Attorneys for Sara L. Kistler
    Acting United States Trustee for Region 17
7

8                  **UNITED STATES BANKRUPTCY COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10  In re:

11  SONICBLUE, INCORPORATED, a Delaware          Case No. 03-51775 MM
    Corporation, DIAMOND MULTIMEDIA
12  SYSTEMS, INC., a Delaware Corporation,        Chapter 11
    REPLAY TV, INC., a Delaware Corporation,
13  and SENSORY SCIENCE CORPORATION,
    a Delaware Corporation,                       [NO HEARING NECESSARY]
14
                      Debtors.
15

16          **NOTICE OF APPOINTMENT OF CHAPTER 11 TRUSTEE**

17  **TO: Dennis J. Connolly, Esq.**

18          Pursuant to 11 U.S.C. Section 1104(d) and Rules 2007.1 and 2008 of the

19  Federal Rules of Bankruptcy Procedure, the Acting United States Trustee for Region 17

20  has appointed you to serve as Chapter 11 Trustee in the above-captioned cases. You

21  are required to notify the undersigned of your acceptance in writing by signing below

22  and returning this notice by first class mail within five (5) business days from receipt of

23  this appointment. You are also required to provide proof of posting a bond in the

24  amount of $625,000. With the exception of $500,000 which will be bonded and under

25  the trustee's immediate control, the remaining funds of these estates will be deposited

26  into a restricted  account with an depository authorized by the United States Trustee in

27
    Notice Of Appointment Of
28  Chapter 11 Trustee

1  Region 17, from which funds may be withdrawn only upon presentation of a valid court
2  order.
3
4
5  Dated: April 16, 2007
6
                                    Sara L. Kistler
7                                   Acting United States Trustee
                                    Region 17
8
9
10 Dated: April 16, 2007
11
                                    Dennis J. Connolly, Esq.
12                                  Alston & Bird LLP
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
   Notice Of Appointment Of
28 Chapter 11 Trustee                                                    2

# Exhibit

# 4

**April 17, 2007**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA



1  | EDWINA E. DOWELL, #149059
Assistant U.S. Trustee

2  | NANETTE DUMAS, #148261
SHANNON L. MOUNGER-LUM, #208071

3  | Office of the United States Trustee
280 S. First Street, Suite 268

4  | San Jose, CA 95113-0002
Telephone:    (408) 535-5525

5  | Fax:              (408) 535-5532

6  | Attorneys for Sara L. Kistler
Acting United States Trustee for Region 17

**The following constitutes
the order of the court. Signed April 17, 2007**

*Marilyn Morgan*
**Marilyn Morgan**
**U.S. Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

In re:

SONICBLUE, INCORPORATED, a Delaware
Corporation, DIAMOND MULTIMEDIA
SYSTEMS, INC., a Delaware Corporation,
REPLAY TV, INC., a Delaware Corporation,
and SENSORY SCIENCE CORPORATION,
a Delaware Corporation,

                    Debtors.

Case No. 03-51775 MM

Chapter 11

[NO HEARING NECESSARY]

## ORDER APPROVING APPOINTMENT OF CHAPTER 11 TRUSTEE

Upon the application of the Acting United States Trustee for Region 17, and it

appearing that Dennis J. Connolly of Alston & Bird LLP, a disinterested person as set

forth in 11 U.S.C. § 101(14), has been appointed by the Acting United States Trustee in

the above-captioned Chapter 11 case, and after due deliberation and sufficient cause

appearing therefor, it is HEREBY ORDERED that the appointment of Dennis J.

Connolly as Chapter 11 trustee in the above-captioned case is approved pursuant to 11

U.S.C. § 1104.

## **END OF ORDER**

Order Approving Appointment
Of Chapter 11 Trustee

1

**COURT MAILING LIST**

2

3

| | |
|---|---|
| Marcus Smith<br>SONICblue, Inc.<br>7 West 41st Avenue, #74<br>San Mateo, CA 94403 | Craig Barbarosh<br>Sue J. Hodges<br>Pillsbury Winthrop LLP<br>101 W. Broadway, Suite 1800<br>San Diego, CA 92101-8219 |
| Albert Boro<br>Pillsbury Winthrop Shaw Pittman LLP<br>50 Fremont Street<br>San Francisco, CA 94105 | William Freeman<br>Pillsbury Winthrop Shaw Pittman LLP<br>725 South Figueroa Street, Suite 2800<br>Los Angeles, CA 90017-5406 |
| Suzzanne S. Uhland<br>O'Melveny & Myers LLP<br>275 Battery St 26th Fl<br>San Francisco, CA 94111 | Steven J. Johnson<br>Gibson Dunn & Crutcher, LLP<br>1530 Page Mill Road<br>Palo Alto, CA 94304 |
| Frank Merola/John Shaffer<br>Stutman Treister & Glatt<br>1901 Avenue of the Stars, 12th Floor<br>Los Angeles, CA 90067 | Robert A. Franklin<br>Murray & Murray<br>19400 Stevens Creek Blvd, Suite 200<br>Cupertino, CA 95014 |
| Bruce MacIntyre<br>Perkins Coie LLP<br>1201 Third Avenue, Suite 4800<br>Seattle, WA 98101 | Bruce Bennett/Mike Schwartz<br>Hennigan Bennett & Dorman<br>865 So. Figueroa Street, Suite 2900<br>Los Angeles, CA 90017 |
| Henry C. Kevane/Ken Brown<br>Pachulski, Stang, Ziehl,<br>Jones & Weintraub<br>150 California St., 15th Floor<br>San Francisco, CA 94111-4500 | William McGrane<br>McGrane Greenfield LLP<br>One Ferry Building, Suite 220<br>San Francisco, California 94111 |
| Ronald Bender/Todd M. Arnold<br>Levene Neale Bender Rankin & Brill LLP.<br>10250 Constellation Blvd., Suite 1700<br>Los Angeles, CA 90067 | Jeannette Schirtzinger<br>Peery-Arrillaga<br>2560 Mission College Blvd. Suite 101<br>Santa Clara, CA 95054 |
| Patrick M. Costello<br>Bialson, Bergen and Schwab<br>2600 El Camino Real #300<br>Palo Alto, CA 94306 | James J. Williams<br>Hain Capital Group, LLC<br>301 Route 17 - 6th Floor.<br>Rutherford, NJ 07070 |
| Glenn P. Zwang<br>Bartko, Zankel, Tarrant & Miller<br>900 Front Street, Suite 300<br>San Francisco, California 94111 | Dana P. Kane<br>Liquidity Solutions<br>1 University Plaza, Suite 312<br>Hackensack, NJ 07601 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Order Approving Appointment
Of Chapter 11 Trustee

2

| Bernard Burk<br>Howard Rice Nemerovski<br>Canady Falk & Rabkin<br>Three Embarcadero Center, 7th Floor<br>San Francisco, CA 94111-4024 | Dennis J. Connolly<br>Alston & Bird LLP<br>One Atlantic Center<br>1201 West Peachtree Street<br>Atlanta, GA 30309-3424 |
|---|---|

Order Approving Appointment
Of Chapter 11 Trustee

3