Entered on Docket
March 26, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

The following constitutes
the order of the court. Signed March 26, 2007

_____
Marilyn Morgan
U.S. Bankruptcy Judge
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>**SONICBLUE INCORPORATED, DIAMOND MULTIMEDIA SYSTEMS, INC., REPLAYTV, INC., and SENSORY SCIENCE CORPORATION,**<br><br>Debtors. | Cases No. 03-51775, 03-51776, 03-51777, and 03-51778-MM<br><br>Chapter 11 cases<br>Jointly administered<br><br>**MEMORANDUM DECISION AND ORDER ON MOTION TO APPOINT A CHAPTER 11 TRUSTEE, MOTION TO CONVERT CASE, AND MOTION TO DISQUALIFY PILLSBURY WINTHROP SHAW PITTMAN LLP AND FOR DISGORGEMENT OF ATTORNEYS' FEES** |

### INTRODUCTION

When claims traders entered this case and started asking hard questions, circumstances came to light that implicated at least debtor's counsel, committee counsel and certain members of the committee, and resulted in the complete breakdown of creditor confidence. The genesis of the problem arose from the pre-petition issuance of an opinion letter, undisclosed by debtor's counsel, assuring payment to certain bondholders who effectively controlled the creditors' committee. Years later, when debtor's counsel objected to these bondholders' claims because of an original issue discount approximating $43

1

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

million, the bondholders demanded indemnification from the law firm. The problem was compounded when debtor's counsel attempted to solve its disabling conflict by "handing off" these claims objections to committee counsel, who accepted the awkward assignment. Incredibly, these same bondholders somehow were also able to insert a provision in the settlement of estate litigation without disclosing that it arguably may provide them with millions more in distributions, at the expense of general unsecured creditors.

A more complete statement of the background is set forth below in the analysis of the motions by the United States Trustee to disqualify Pillsbury Winthrop Shaw Pittman LLC as counsel for the debtor and for disgorgement of attorneys' fees, its motion for the appointment of a chapter 11 trustee, and the motion of SONICblue Claims, LLC for conversion of the case to one under chapter 7. For the reasons explained, the motion for disqualification is granted, and the court finds that the appointment of a chapter 11 trustee is warranted as being in the best interests of the creditors and other interested parties.

## FACTUAL BACKGROUND

### *Formation of Joint Venture*

SONICblue Incorporated and three operating subsidiaries, Diamond Multimedia Systems, Inc., ReplayTV, Inc., and Sensory Science Corporation (collectively, SONICblue), designed and marketed consumer electronic products. Pillsbury Winthrop Shaw Pittman LLP ("PWSP") served as SONICblue's longtime general corporate and litigation counsel. On January 3, 2001, SONICblue formed S3 Graphics Co., Ltd., a joint venture with VIA Technologies, Inc., to operate SONICblue's graphics chip business. Among the assets that SONICblue contributed to the joint venture was its graphics intellectual property, specifically including rights under a 1998 patent cross-license with Intel Corporation. The rights to use Intel's graphics patents were so important that the joint venture agreement included a liquidated damages clause at article 5.6 entitling the joint venture and VIA each to damages of up to $70 million if the joint venture were ever enjoined from using the Intel cross-license. From the inception of the joint venture, there were serious disputes, including the threat of litigation, between SONICblue and VIA. In the context of settlement proposals in 2002, the parties

2

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

1  negotiated a $15 million loan from VIA to SONICblue. However, neither a settlement nor the loan were
2  consummated pre-petition.

*Issuance of Senior Debentures and Related Opinion Letter by PWSP*

In April 2002, SONICblue raised financing in a private placement issuance of $75 million in 7¾% senior secured subordinated convertible debentures. Three institutional bondholders, Portside Growth & Opportunity Fund Ltd., Smithfield Fiduciary LLC, and Citadel Equity Fund Ltd., acquired the senior debentures at a discount for $62.5 million. The senior debentures were also partially secured by SONICblue's interest in shares of United Microelectronic Corporation ("UMC"), a Taiwanese company. Importantly, the indenture provided for the subordination of the senior debentures to certain obligations at Section 4.1:

> The payment of the principal of, premium, if any, and interest on all Debentures . . . issued hereunder shall, to the extent and in the manner hereinafter set forth, be subordinated and subject in right of payment to the prior payment in full of all Senior Indebtedness, whether outstanding at the date of this Indenture or thereafter incurred.

"Senior Indebtedness" was defined in Section 1.1 of the indenture:

> "Senior Indebtedness" shall mean the principal of, premium, if any, interest on . . . and any other payment due pursuant to any of the following, whether outstanding on the date of this Indenture or thereafter incurred or created:
>
> * * *
>
> (g)    All indebtedness of the Company due and owing to Via Technologies, Inc. in an aggregate principal amount not to exceed $15,000,000 or the equivalent thereof in any other currency of composite currency (the "Via Indebtedness");

Existing debentures in the amount of $100 million issued in 1996 were also subordinated to the senior debentures. PWSP partner Jorge del Calvo was designated for notice purposes on the indenture on behalf of SONICblue.

In its capacity as counsel to SONICblue, on April 22, 2002, PWSP issued to the senior bondholders a written opinion as to the enforceability of the debentures. This opinion letter reads in pertinent part:

> 2.    . . . Each of . . . the Purchase Agreement, the Registration Rights Agreement, the Indenture, the Pledge and Security Agreement and the Option Agreement, when duly executed and delivered by the Buyers, will each constitute a valid and binding agreement of the Company, enforceable against the Company in accordance with its terms.

**UNITED STATES BANKRUPTCY COURT**
**For The Northern District Of California**

* * *

3. The issuance and sale of the Debentures have been duly authorized. Upon issuance and delivery against payment therefor in accordance with the terms of the Indenture and the Purchase Agreement, the Debentures will constitute valid and binding obligations of the Company, enforceable against the Company in accordance with their terms.

* * *

9. . . . (b)  Our opinion in paragraph 2 above is subject to and limited by (i) the effect of applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally. . . .

In what may have been a scrivener's error, the bankruptcy limitation in paragraph 9 referenced only paragraph 2 and not paragraph 3 of the opinion letter.

*Chapter 11 Filing and PWSP's Bankruptcy Rule 2014 Disclosures*

Just six months after the issuance of the senior debentures, SONICblue was unable to meet its maturing financial obligations and entered into a retainer agreement for PWSP to "represent it in its effort to restructure its obligations to certain of its existing . . . debt . . . . The Firm's engagement will also include representation of SONICblue in . . . any case prosecuted under Title 11 of the United States Code . . . ." PWSP partner Jorge Del Calvo was copied on the retainer letter. SONICblue and the subsidiaries filed chapter 11 petitions on March 21, 2003. While the cases are jointly administered, they have not been substantively consolidated.

On April 11, 2003, PWSP filed an employment application accompanied by a verified statement pursuant to Bankruptcy Rule 2014, which disclosed:

3. The Firm has been engaged as the Debtors' corporate and litigation counsel since approximately 1989. During that time, the Firm has provided legal representation to the Debtors in a variety of areas, including corporate and securities matters, mergers and acquisitions, litigation, and intellectual property matters. The Firm has been working with the Debtors in connection with their restructuring since approximately October 25, 2002 when the Firm was retained to provide advice concerning the restructuring of the Debtor's liabilities and business operations.

The disclosure continued as follows:

6. As discussed below, I, the Firm, and certain of its partners, counsel, and associates may have in the past represented, and may presently and likely in the future will represent creditors or stockholders of the Debtors in matters unrelated

4

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

> to these Chapter 11 Cases. A preliminary conflicts search performed at my direction discloses that the Firm may have represented or represents entities that are involved in some capacity with one or more of the Debtors, or may have some other relationships with these entities, in matters unrelated to the Debtors. To the best of my knowledge, the Firm's relationships with these entities is as follows. . . .

However, PWSP failed to disclose its connection resulting from the issuance of the opinion letter to the senior bondholders one year earlier. It added, "The Firm will continue to monitor its relationship with the creditors and other parties in interest in these cases and, as it discovers additional information requiring disclosure, will promptly supplement this application with any appropriate disclosures." The court appointed PWSP as counsel for the debtors. Marcus Smith, the Chief Financial Officer of SONICblue, was designated its responsible individual. PWSP diligently filed supplemental disclosures on May 30, 2003, January 23, 2004, October 27, 2004, July 13, 2005, July 27, 2005, November 4, 2005, and June 5, 2006, none of which mentioned the opinion letter.

The Office of the United States Trustee appointed an Official Committee of Unsecured Creditors on March 21, 2003. The court authorized the employment of Ron Bender of the law firm Levene, Neale, Bender, Rankin & Brill LLP ("LNBRB") as counsel for the committee on April 11, 2003. As originally constituted, the committee was comprised of eight members: Portside Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. (collectively, the "senior bondholders"), represented by Bruce Bennett of Hennigan, Bennett & Dorman, Matsushita Kotobuki Electronics Sales of America LLC and Matsushita Kotobuki Electronics Industries, A-Max Technology Co. Ltd., Manufacturers' Service Limited, and Maxtor Corporation. In October 2003, Baltrans Logistics Inc. replaced Maxtor Corporation on the committee. After the initial months of the case, however, only the three senior bondholders and the two Matsushita companies remained active in the cases, making the senior bondholders the majority voice on the committee. Including the anticipated distribution collectable from the junior bondholders, the senior bondholders effectively control approximately two-thirds of the claims in these cases.

Projecting that they would exhaust their cash reserves by April 20, 2003, the debtors immediately sought and obtained court approval of the sales of their three operating businesses, the Go Video, ReplayTV, and Rio product lines. Thereafter, these became liquidating chapter 11 cases.

5

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

Notably, there is no functioning board of directors to whom Smith reports. The debtor holds nearly $80 million in funds for distribution and anticipates receiving an additional $6 million from preference settlements. Secured claims have been paid in full from the proceeds of sale, and a distribution of 33% to unsecured creditors is anticipated.

### *Breach of Fiduciary Action in Connection with Issuance of the Senior Debentures*

On April 21, 2005, some of the junior bondholders filed a complaint in the Superior Court for Santa Clara County against Smith and former officers and directors of SONICblue, Kenneth Potashner, John Todd, Terry Holdt, Edward Esber, Robert Lee and James Schraith. The junior bondholder plaintiffs assert claims for breach of fiduciary duty and constructive fraud in connection with the issuance of the senior debentures in 2002. They assert that the defendants improperly authorized and entered into the financing arrangement while SONICblue was in the zone of insolvency and hopelessly unable to honor its long-term bond obligations. They further assert that by pledging its UMC stock in the transaction, SONICblue rendered a significant asset unavailable to junior bondholders in a liquidation. The defendants removed the complaint to this court on June 14, 2005 on the basis that they may have substantial claims for contribution and indemnification against the debtor. That adversary proceeding, Adv. No. 05-5338, remains pending, though inactive.

### *VIA Litigation and Settlement Negotiations*

VIA and S3 Graphics filed duplicate proofs of claim for $70 million each on July 17, 2003 based on a breach of the joint venture agreement. They assert the breach was caused by the failure to pay certain accounts payable, offering non-ordinary course discounts to accelerate the collection of receivables, wrongful retention of receivables collected on behalf of the joint venture, and the failure to contribute certain assets to the joint venture, and they assert they are also entitled to liquidated damages if enjoined prospectively from the use of the Intel cross-license. SONICblue objected to the claims and filed an adversary complaint for affirmative relief on December 21, 2004 asserting that VIA and S3 breached the joint venture agreement by failing to pay assumed obligations, that VIA breached its fiduciary duty in the operations of the joint venture and the settlement of patent litigation with Intel, and that S3 aided and abetted the breach of fiduciary duty. It sought compensatory and punitive damages, equitable subordination of VIA's and S3's claims, restitution, and an accounting. PWSP

represented SONICblue in the VIA/S3 litigation.

SONICblue engaged in concurrent litigation with Intel Corporation concerning the termination or assumption of the patent cross-license and the parties' respective rights. This litigation was also significant because termination of the license would arguably trigger the liquidated damages provision of the joint venture agreement. Because of PWSP's prior representation of Intel, the debtor retained O'Melveny & Myers LLP as special litigation counsel to represent it in the dispute with Intel.

The various claims in the litigation with VIA and S3 and with Intel reportedly involved complex, disputed facts. The declaration of Albert Boro, a PWSP partner, sets out the following chronology concerning the litigation and related settlement negotiations. Settlement discussions between SONICblue and VIA and S3 began in earnest on August 11, 2005 when the parties and their counsel met to discuss a proposed structure for settlement. Following the initial meeting, counsel for SONICblue participated in conference calls with special litigation counsel, LNBRB as committee counsel, and Bennett as counsel for the senior bondholders. Based on those discussions, Boro concluded that a global settlement that included Intel was necessary and that a settlement amount of less than $25 million would be acceptable to the committee. Committee counsel authorized the debtor to counter with a settlement offer of $6 million. Bennett, as counsel for the senior bondholders, confirmed on August 30, 2005 that his clients would support a $6 million counteroffer. Boro believed that the consent of the senior bondholders to the terms of a settlement was essential to court approval.

On September 12, 2005, counsel for VIA sent to PWSP a draft settlement term sheet proposing that VIA be allowed a general unsecured claim in the amount of $27.5 million. In a subsequent settlement meeting among counsel held on September 15, 2005, VIA and S3 reduced their settlement demand to $19 million. Bennett indicated that the senior bondholders would support a settlement of only $10 million. The debtor, through Smith, authorized a $10 million counteroffer. It is unclear whether the committee at large was consulted at this juncture or why debtor's counsel consulted only Bennett. Counsel ultimately reached a tentative agreement as to a settlement amount of $12.5 million, subject to the approval of the respective clients and of creditors. The debtor, VIA, and S3 agreed immediately to the settlement amount.

On September 20, 2005, Bennett confirmed the senior bondholders' agreement to a $12.5 million

7

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

allowed claim, provided the settlement included, *inter alia*, that the allowed claim be neither senior nor junior to other general unsecured claims. The allowed amount of the defendants' claim appears to have been fixed by September 20, 2005. Again, the record is unclear whether the committee participated at this stage other than through the senior bondholders. In a conference call among counsel that same day, SONICblue accepted the settlement terms but requested language that the allowed claim be neither senior nor junior to other general unsecured claims. There were further discussions that the allowed claim of the defendants would be a general unsecured claim, would receive an anticipated distribution in the bankruptcy case of approximately 25%, and would not have priority, yet would not be subordinated relative to other general unsecured claims. Boro reports that counsel for VIA and S3 "posed questions about subordination of the claims of the Senior Noteholders and other creditors, and expressed concern that other creditors not unduly benefit at their clients' expense, but they nevertheless agreed that their [allowed] claim was neither senior nor junior to other general unsecured claims."

Boro's declaration reflects that at the time of the September 15, 2005 settlement meeting, he was aware that the senior bondholders were subordinated to VIA Indebtedness under the terms of the indenture. His declaration also reflects that, prior to September 20, 2005, he had formed the belief that the VIA Indebtedness referred only to the proposed $15 million loan to SONICblue that was never made. On September 26, 2005, counsel for SONICblue and the defendants finalized a draft of the proposed settlement term sheet, which included the following provision:

> Claimants shall jointly hold a single, allowed general unsecured claim in the Chapter 11 case of SONICblue Inc., which claim shall be afforded the benefits and priority of SONICblue's other allowed general unsecured claims and shall be neither senior nor junior to any other allowed general unsecured claim, in the amount of $12.5 million. . . .

Boro sent the proposed term sheet to Bennett and to LNBRB on September 27, 2005. In a conference call held later that day, the committee approved the settlement terms. Bender stated in a declaration that this proposed term sheet was the only document concerning the settlement terms that was provided to committee counsel before it received the final settlement agreement.

Finalizing the settlement between SONICblue, VIA, and S3 was delayed and made complicated by the difficulty in reaching a resolution with Intel over the parties' respective rights under the patent

8

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

cross-license. For that reason, the initial draft of a settlement agreement was not prepared until January 25, 2006, when SONICblue's special litigation counsel, O'Melveny & Myers, circulated a draft that contained a provision dealing with VIA's allowed claim that read substantially the same as the one in the September 26, 2005 term sheet. Boro stated in his declaration that, in April or early May 2006, he and PWSP partner Thomas Loran proposed that the settlement agreement include language specifically stating that the defendants' allowed claim was not "Senior Indebtedness" under the indenture for the senior debentures. Purportedly, the reason the PWSP attorneys made the suggestion was to foreclose future litigation over the priority of VIA and S3's allowed claim. They also believed that "VIA Indebtedness" referred to the $15 million loan that was never made.

On May 12, 2006, O'Melveny & Myers circulated a revised draft of the settlement agreement with the following language added:

> Claimants and the Debtor agree that the Allowed Claim is not, and shall not be treated as, "Senior Indebtedness" under the terms of the Debtor's Indenture, dated as of April 22, 2002, for the 7-¾ Secured Senior Subordinated Convertible Debentures due 2005.

VIA agreed to the language waiving "Senior Indebtedness" status on June 1, 2006. Substantially the same language was included in a later revised draft circulated on June 16, 2006 and in the final settlement agreement.

### *Objection to Claim of Senior Bondholders*

Since substantially all assets have been liquidated, PWSP has been prosecuting avoidance actions and objections to claims. It has divided and shared the work with LNBRB, however, PWSP retained the more complex litigation or litigation requiring some knowledge of the background of the debtor's operations. PWSP initially examined the claims of the senior bondholders and the junior bondholders. It expended 49.50 hours, incurring $23,237.50 in legal fees, to complete its analysis of the senior bondholders' claims, including research on the applicability of fraudulent transfer law and usury law to the transaction. Based on its analysis, it identified a significant problem with the original issue discount granted the bondholders, the difference between the face amount and the amount actually paid for the debentures. The senior bondholders also received other consideration in the transaction, including the UMC stock, that rendered the valuation of the original issue discount more complex.

1  SONICblue asserts that the original issue discount constituted unamortized interest as of the petition
2  date that is subject to disallowance under Bankruptcy Code § 502(b)(2).  On July 20, 2006, PWSP
3  attorney Matthew Walker sent an email to Bennett setting forth his analysis of the original issue
4  discount and asserting that the bondholders' claim may be subject to partial disallowance under
5  § 502(b)(2) to the extent of any unmatured interest as of the petition date. Walker's analysis showed
6  an original issue discount of $43 million. He closed with an invitation to engage in a dialogue to resolve
7  the matter short of formal litigation.

8  Bennett contacted PWSP partner Craig Barbarosh on August 24, 2006 to discuss SONICblue's
9  challenge to the bondholders' claim. He also brought to Barbarosh's attention that PWSP had issued
10 the opinion letter to the bondholders in connection with the issuance of the debentures. Bennett asserted
11 that the bondholders had relied on the opinion letter, which they interpreted as assuring that their claims
12 were allowable in a subsequent bankruptcy case. He further indicated that the bondholders would
13 demand that PWSP defend and indemnify them for any losses resulting from SONICblue's challenge
14 to their claim. Bennett's partner followed up on September 5, 2006 with a letter to the managing
15 partner of PWSP demanding indemnification from PWSP for any shortfall to which the senior
16 bondholders may be subjected as a result of SONICblue's objection to their claim. In the letter, he
17 indicated that to the extent the bondholders are unable to recover in the bankruptcy case the full
18 principal amount of the debentures, they intended to pursue PWSP for negligent misrepresentation and
19 negligence, among other claims.

20 Barbarosh asserts in his declaration that the telephone call on August 24, 2006 was the first time
21 he became aware of the April 22, 2002 opinion letter. PWSP immediately contacted counsel for the
22 committee, informed Bender of the bondholders' indemnification demand, and turned over to the
23 committee the task of prosecution of the objection to the claims of the senior bondholders. On
24 September 6, 2006, it forwarded its work file containing its analysis to LNBRB. PWSP did not,
25 however, file a supplemental Bankruptcy Rule 2014 disclosure to address the claim of the senior
26 bondholders. When it filed its eighth interim application for compensation with the court on October
27 18, 2006, PWSP did address the analysis of and potential objection to the claim of the senior
28 bondholders. However, it simply disclosed, "The matter was turned over to the Creditors' Committee

for prosecution." PWSP partner Boro asserts in his declaration that he was unaware of any potential or actual claim by the senior bondholders at the time he negotiated the language concerning the priority and treatment of VIA's allowed claim under the settlement between September 2005 and June 2006.

### *Approval of VIA Settlement*

The VIA settlement agreement was filed under seal on October 10, 2006 with the debtor's motion to approve the settlement. Bender asserts that LNBRB first received the settlement agreement a few days before it was filed with the court. Because the settlement agreement was lengthy and complex and because LNBRB had not seen any prior drafts, it requested that debtor's counsel verbally walk LNBRB through the settlement agreement. In a conference call on October 4, 2006, Suzanne Uhland of O'Melveny & Myers reviewed the document and the terms of the settlement agreement with LNBRB partners Ron Bender and Craig Rankin. In a declaration, Bender states that there was no discussion of the waiver in the settlement agreement of VIA's "Senior Indebtedness" status under the indenture. He also indicated that the committee was very pleased with the settlement because it had been willing to settle the litigation for $25 million. The court approved the VIA settlement on October 31, 2006.

### *Joint Disclosure Statement and Plan and Disclosure of Indemnification Demand Against PWSP*

The debtors, in consultation with the committee, had determined for strategic reasons to defer efforts in these cases to propose and confirm a plan of reorganization. The reasons included the uncertainty posed by the significant claims of VIA and S3 on the confirmability of and distributions under a plan, the potential rejection of the Intel cross-license at confirmation, giving rise to up to $70 million in liquidated damages, and the desire to substantively consolidate the estates under a plan after the VIA litigation was settled. The committee assumed the lead role in preparing the joint disclosure statement and plan. The initial disclosure statement filed on December 15, 2006 disclosed PWSP's conflict as follows:

> However, as a result of a conflict that has been asserted by the Senior Noteholders with respect to counsel to the Debtors, the Creditors' Committee is now in charge of analyzing the Senior Notes Claims.

Upon the objection of creditors Riverside Contracting, LLC and Riverside Claims, LLC, the disclosure statement was amended on January 18, 2007, elaborating on the description of the conflict

11

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

as follows:

> [U]ntil recently, counsel to the Debtors was in charge of analyzing the Senior Notes Claims. As a result of the Senior Noteholders' contention that counsel to the Debtors had pre-petition issued to the Senior Noteholders an unqualified legal opinion that the Senior Notes were enforceable against the Debtors in accordance with their terms, counsel to the Debtors requested the Creditors' Committee to assume the role of analyzing the Senior Notes Claims.

Neither the first amended disclosure statement nor the prior version disclosed that the senior bondholders are members of the creditors' committee, which has been charged with objecting to the bondholders' claims. They also failed to disclose that Smith, who would continue to serve as Chief Financial Officer and Responsible Individual, was a defendant in the junior bondholders' litigation.

On January 22, 2007, creditors Riverside Contracting, LLC, Riverside Claims, LLC, and Argo Partners, Inc. objected to the first amended disclosure statement, raising for the first time before the court the waiver in the VIA settlement agreement of the "Senior Indebtedness" status to which the VIA allowed claim was arguably entitled pursuant to the senior indenture. The objecting creditors asserted that the waiver effectively diluted the distribution to unsecured creditors because VIA otherwise would have accepted an allowed claim in a lower amount. SONICblue Claims LLC ("SB Claims") is a claims trader that has acquired at least $160,000 of the claims in this case and is the successor in interest to Argo Partners. It admittedly has been interested in acquiring the VIA claim since 2006 to profit from the "Senior Indebtedness" provision of the indenture.

Bender states that the committee first learned of the issue from the objections to the disclosure statement. He, at least, had previously been unaware of the connection between the waiver of status in the VIA settlement agreement and the "Senior Indebtedness" provision in the senior indenture. With respect to the committee's involvement in the negotiation of the VIA settlement, Bender explained to the court at the disclosure statement hearing on January 23, 2007:

> The Creditors' Committee was not a party to that litigation. And there were so many complicated confidentiality agreements that the Committee wasn't even privy to the top-level of confidentiality. So all I would do and Mr. Rankin would do is we would periodically call primarily the O'Melveny lawyers . . . to get updates from her. . . . We saw that as our limited role, which is why our fees with respect to that litigation are minuscule compared to the fee in the case. . . . [T]he Committee . . . was essentially a client – we were advised that really we were likely to lose on at least the $70 million part."

This statement appears to be consistent with Bender's declaration in opposition to the motions presently before the court:

> While counsel to the Debtors (primarily Ms. Uhland of OMM) would periodically provide general status reports to LNBRB (primarily to Mr. Rankin and Ms. Wells who were the partners at LNBRB principally in charge of dealing with the VIA/S3/Intel litigation) and communicate with LNBRB, and did obtain the authority of the Committee (whose active participants at that time were the three Senior Noteholders and the two Matsushita entities) to settle with VIA/S3 by giving them an allowed general unsecured claim of not more than $25 million, to the best of my knowledge, LNBRB was not a party to any of the confidential settlement discussions that ensued, and LNBRB was not provided with any drafts of the actual VIA/S3 settlement agreement.

However, this characterization appears markedly at odds with the following statement in the Seventh Interim Application of LNBRB for Approval of Fees and Reimbursement of Expenses filed October 18, 2006: "LNBRB played a material role in negotiating and documenting the settlement." LNBRB has also requested that the court approve $102,027.50 in legal fees incurred for services in connection with the VIA litigation.

More than six months after the senior bondholders first asserted their claims against PWSP, and only after the United States Trustee filed the motion for disqualification, PWSP filed a supplemental Bankruptcy Rule 2014 disclosure on March 5, 2007 that states:

> Portside Growth and Opportunity Fund, Ltd., Smithfield Fiduciary LLC and Citadel Equity Fund Ltd. (collectively, the "Senior Noteholders"), are holders of the 7¾% Senior Secured Subordinated Convertible Debentures due 2005 (the "Senior Notes"). The Debtors scheduled the claim of the Senior Noteholders for in excess of $77 million, and each of the three Senior Noteholders filed its own proofs of claim in unspecified amounts related to the Senior Notes. In connection with its Application, the Firm previously disclosed its substantial pre-petition representation of the Debtors, including for corporate and securities matters. As part of that representation, the Firm represented SONICblue in issuing the Senior Notes. As is typical in such financing transactions, the Firm issued a legal opinion to the Senior Noteholders. Pursuant to letter dated September 5, 2006, counsel to the Senior Noteholders sought indemnity from the Firm related to the Senior Notes (the "Demand"). The Firm has rejected the Demand and declined to provide any indemnity to the Senior Noteholders, and immediately upon receipt of the Demand the Firm informed counsel for the Creditors' Committee of the Demand and turned over the analysis of all issues regarding the allowance of the Senior Noteholders' claims to the Committee. No lawyer in the firm who handled the financing transaction was involved in the firm's analysis regarding the Senior Noteholders' claims. Whether the Demand creates any disabling conflict or renders the Firm not "disinterested" is presently before the Court on motions filed by the U.S. Trustee.

PWSP submits that its failure to file this supplemental disclosure earlier was inadvertent.

## LEGAL DISCUSSION

**I.    The Best Interests of Creditors Mandate the Disqualification of PWSP from its Representation in the Case and the Appointment of a Chapter 11 Trustee.**

Under § 327(a) of the Bankruptcy Code, a debtor in possession may employ attorneys that do not hold an interest adverse to the estate and that are disinterested persons. Thus, to serve as debtor's counsel, counsel must be free of all conflicting interests that might impair the impartiality and neutral judgment that they are expected to exercise. *In re Bellevue Place Associates,* 171 B.R. 615, 626 (N.D. Ill. 1994). "Conflicting loyalties produce inadequate representation, which threatens the interests of the debtor, the trustee and the creditors, and compromises the ability of courts to mete out justice." *In re Tevis*, 347 B.R. 679, 689 (9th Cir. B.A.P. 2006)(discussing California state law to define "adverse interest" under § 327(a)). *See also In re Wheatfield Business Park LLC*, 286 B.R. 412, 417-418 (Bankr. C.D. Cal. 2002). The presence of an actual conflict of interest renders counsel ineligible and constitutes grounds for disqualification from further service. *See In re Plaza Hotel Corp.*, 111 B.R. 882, 889-91 (Bankr. E.D. Cal.)(chapter 11 debtor's counsel disqualified for failing to disclose dual representation of the debtor and of debtor's owner/guarantors), *aff'd*, 123 B.R. 466 (9th Cir. B.A.P. 1990). Section 1104(a)(2) of the Bankruptcy Code creates a flexible standard for appointing a trustee when it is in "the interests of the creditors, equity security holders, and other interests of the estate." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989). It requires the court to weigh competing interests and, under appropriate circumstances, to appoint a trustee regardless of whether "cause" exists within the meaning of § 1104(a)(1). *Id.* Although the United States Trustee has moved for the appointment of a trustee both for cause under § 1104(a)(1) and in the best interests of creditors under § 1104(a)(2), it need only prove one of these two statutory bases. *Id.*

The undisputed facts establish that in April 2002, PWSP issued an opinion letter to SONICblue's senior bondholders. Six months later, SONICblue a retained PWSP as its bankruptcy counsel. In March 2003, when SONICblue filed its chapter 11 petition, PWSP submitted its statement pursuant to Fed. R. Bankr. P. 2014 to disclose its connections to "the debtor, creditors and any other interested parties." The statement did not note any connection with the senior bondholders. Aware of its ongoing duty to

disclose any conflicts and connections, PWSP filed seven supplemental Rule 2014 disclosure statements through June 2006. None of these supplemental statements mentioned the 2002 opinion letter or any other connection between PWSP and the three senior bondholders. Then, in late August 2006, the three senior bondholders demanded indemnification from PWSP based on the 2002 opinion letter in the event that objections to the bondholders' claims resulted in any losses to the bondholders. This verbal demand was followed with a written demand on September 5, 2006. The next day PWSP transferred its files concerning SONICblue's objections to the bondholders' claims to LNBRB. Six months later, on March 5, 2007, after the United States Trustee had filed motions both to appoint a trustee and to disqualify PWSP, PWSP filed its eighth supplemental Rule 2014 disclosure statement that provided a detailed explanation of PWSP's conflict of interest with the senior bondholders.

From these facts it is clear that PWSP knew it had a continuing duty to update its Rule 2014 disclosures upon learning of any undisclosed connections or conflicts. It is also apparent that as of late August 2006, PWSP knew it had a disabling conflict of interest because it immediately sought the aid of LNBRB in an attempt to resolve the conflict. Yet, PWSP failed to apprise the court of these facts. PWSP's attempt to characterize its failure as inadvertent oversight rings hollow in the face of its previous history of supplemental disclosures. PWSP argued in court that the partner in charge "assumed" a supplemental disclosure had been made, but the firm has not offered any evidentiary foundation for that assumption. The declaration of PWSP partner William Freeman indicates that Freeman had signed several of the earlier supplements and that he typically delegated responsibility for drafting the disclosures. There is no indication, however, that Freeman or any other PWSP partner undertook responsibility, or asked someone else to assume responsibility, for preparing a supplemental disclosure when the actual conflict of interest concerning the senior bondholders arose. PWSP has neither offered proof of any time spent drafting the disclosure nor produced a draft of a disclosure that the firm somehow failed to file. In the end, however, whether intentional or inadvertent, PWSP's failure to disclose this significant and disabling conflict in any reasonable fashion mandates immediate disqualification of PWSP from its representation in this case. Estate professionals must make full, candid and complete disclosures of all facts affecting their eligibility for employment. *In re Plaza Hotel Corp.*, 111 B.R. at 883, *aff'd*, 123 B.R. 466 (9th Cir. B.A.P. 1990). *See also Neben & Starrett, Inc. v.*

*Chartwell Financial Corp. (In re Park-Helena Corp.)*, 63 F.3d 877, 881 (9th Cir. 1995), *cert. denied*, 516 U.S. 1049 (1996)(affirming denial of all fees after debtor's counsel failed to fully disclose circumstances surrounding payment of firm's retainer). The Rule 2014 disclosure requirements are strictly enforced. *Park-Helena*, 63 F.3d at 881-82. Negligent omissions do not excuse failures to disclose. *Plaza Hotel*, 111 B.R. at 883. Although PWSP has offered its future service in some more limited capacity, it would not be helpful because the firm's motives in this case would remain subject to attack.

The entirety of the undisputed facts also provides clear and convincing evidence that the appointment of a chapter 11 trustee is necessary to restore creditor confidence in the bankruptcy system and to assure that there is no lingering taint from PWSP's representation of the debtor. Neither the court nor the creditors may ever learn why PWSP or Smith, as debtor's responsible individual, failed to bring PWSP's conflict to the court's attention. But, that unanswered question is less important with the appointment of a strong, neutral trustee, who has no connections to any interested party.

The presence of a trustee will also alleviate any doubts regarding Smith's role as SONICblue's responsible individual. Both the United States Trustee and SB Claims have questioned whether Smith has relinquished his management responsibilities to PWSP. As the United States Trustee pointed out, Smith's services are part-time at best and SONICblue has no Board of Directors to whom Smith is required to report. Additionally, it is troubling that the Disclosure Statement filed with the court failed to divulge that Smith is a defendant in a lawsuit by SONICblue's junior bondholders that alleges that Smith and SONICblues' former officer and directors breached their fiduciary duties to the company when they authorized the issuance of the senior debentures in 2002. In light of these substantial concerns, the appointment of a trustee is warranted.

**II.    It is Not in the Best Interest of Creditors to Convert This Case to Chapter 7.**

SB Claims has asserted that conversion to chapter 7 is preferable to the appointment of a chapter 11 trustee. Althougs SB Claims relies on several justifications for conversion, in the court's view, the primary reason to convert would be to remove the influence of the creditors' committee from this case. The committee and LNBRB in its filings with the court, support as its "first choice" the retention of PWSP as debtor's counsel while an examiner reviews the pending allegations. Because the facts indicate at least the appearance of impropriety by the committee and LNBRB, SB Claims's concerns

in this regard are substantial.

During the past year and a half, SONICblue's litigation against VIA and S3 has been the main roadblock to the proposal of a plan and the conclusion of this case. The three senior bondholders were actively represented in the settlement negotiations by Bennett. At the same time, these same senior bondholders were both members and an effective majority of the committee. As committee members, the senior bondholders were and are fiduciaries that bear a duty of undivided loyalty to provide impartial service in the interests of the creditors that they represent. *In re Caldor, Inc.*, 193 BR 165, 169 (Bankr. S.D.N.Y. 1996)*; In re Microboard Processing, Inc.*, 95 B.R. 283, 284 (Bankr. D. Conn 1989); *In re Mesta Machine Co*, 67 B.R. 151, 156 (Bankr. W.D. Pa. 1986). Because the bondholders appear to have used their position on the committee to insert themselves into the settlement negotiations without revealing a hidden agenda, they may have breached their fiduciary duty to the unsecured creditor body. Whether their motive was simply to save litigation costs for the estate by avoiding future litigation over the priority of VIA's claim, or, instead, to assure a larger return on their individual investments is not known. In fact, as Bennett noted, he had never personally appeared in court until March 19, 2007. During the four years of this case, he has operated in the shadows and, until January 23, 2007, it was not generally known to this court or the creditor body that the three senior bondholders were serving on the committee.

SB Claims also expresses concern that LNBRB may have failed to fulfill its role as a watchdog on behalf of the unsecured creditors. First, it appears that LNBRB failed to independently review the settlement agreement between VIA and SONICblue. Although LNBRB asserted in its fee application that it was "intimately" involved in the VIA settlement, in court it has acknowledged that it was essentially a "client" with respect to the settlement negotiations. Similarly, in his declaration on these motions, Bender states that LNBRB received the VIA settlement agreement after it was a "done deal." Rather than review the lengthy document with fresh eyes, Bender called upon O'Melveny & Myers, SONICblue's special litigation counsel, to verbally walk through the settlement's main points. Second, when the actual conflict arose between PWSP and the senior bondholders, SB Claims points out that LNBRB accepted responsibility for prosecuting the objections to the bondholders' claims without considering its own connections to the bondholders and the fact, or at least appearance, that it might also

17

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

be conflicted. Professionals retained by an official committee of unsecured creditors owe fiduciary duties to the committee and its constituency. *Caldor,* 193 B.R. at 170; *Matter of Celotex Corp.*, 123 B.R. 917, 920 (M.D. Fla. 1991); *Mesta Machine Co*, 67 B.R. at 156. This includes an obligation to represent fairly the interest of the entire creditor class, not just the committee members. *In re General Homes Corp.*, 181 B.R. 870 (Bankr. S.D. Tex. 1994); *In re EBP, Inc.*, 171 B. R. 601 (Bankr. N.D. Ohio 1994); *Mesta Machine Co*, 67 B.R. at 156; *Pension Benefit Guaranty Corporation v. Pincus, Verlin, Hahn Reich & Goldstein Professional Corp.*, 42 B.R. 960, (E.D. Pa. 1984). It is not clear at this juncture whether LNBRB's handling of the objections of the bondholders was an actual conflict of interest, however, it is worth noting that under § 328(c), unless adequate disclosure is made and prior approval of the court is obtained, committee counsel can be denied compensation if at any time during the representation counsel is not a disinterested person. *Mesta Machine*, 67 B.R. at 157-158. No disclosures were made and no court approval was obtained with respect to LNBRB's acceptance of the claims objections referred from PWSP. Finally, SB Claims suggests, and the record does not dispel, the belief that LNBRB's conduct was a self-interested act to protect its referral sources. A committee controlled by the three senior bondholders hired LNBRB and, of course, has the continuing ability to fire LNBRB. If not an actual conflict, these facts certainly raise questions regarding LNBRB's suitability to vigorously pursue the claims objections on behalf of the estate. Moreover, the protective atmosphere surrounding this close-knit referral circle is reminiscent of the "opprobrious" bankruptcy ring and the cronyism that Congress decried in the legislative history of the Bankruptcy Reform Act of 1978. H. Rep. No. 95-595, at 6011 (Sept. 8, 1977).

The fact that counsel for claims traders flagged the concerns over potential improprieties or that the claims traders' may be acting in their own self-interest does not detract from the troublesome nature of their arguments. Nevertheless, these very significant concerns are outweighed in this case by the need for the appointment of a strong and disinterested trustee.

There have been serious allegations that the case is being run by and for the benefit of counsel. As a result, an active trustee who will formulate an independent strategy and direct its own counsel is critical. It is important to this court that the United State Trustee can tap into a large pool of possible trustees by conducting a nationwide search. In this way, the United States Trustee will have a far

1  greater opportunity to locate a strong trustee with the appropriate qualifications and without connections
2  to this case and this legal community. Additionally, if the case remains in chapter 11, the Bankruptcy
3  Rules require, as a safeguard, that the United States Trustee's application for an order approving either
4  the appointment or the election of a trustee must include a disclosure of all the proposed trustee's
5  connections to the debtor, creditors and other parties in interest. Fed. R. Bankr. P. Rule 2007.1(c).
6  There is no similar disclosure requirement in chapter 7.

## CONCLUSION

After careful review of the evidence, consideration of both oral and written argument, the court concludes that the United States Trustee has satisfied its burden of establishing that PWSP must be disqualified from its representation in this case and that the appointment of a chapter 11 trustee is in the best interests of "creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2). The issue of disgorgement of fees is reserved for a later hearing after review by the appointed trustee.

Good cause appearing, IT IS SO ORDERED.

**\* \* \* END OF ORDER \* \* \***

**UNITED STATES BANKRUPTCY COURT**
**For The Northern District Of California**

19

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**

1 Case No. 03-51775-MM

2 **SERVICE LIST**

| | |
|---|---|
| CRAIG A BARBAROSH<br>PILLSBURY WINTHROP LLP<br>650 TOWN CENTER DRIVE 7TH FLOOR<br>COSTA MESA CA 92626-7122 | SUZZANNE S UHLAND<br>O'MELVENY & MYERS LLP<br>EMBARCADERO CANTER WEST<br>275 BATTERY STREET<br>SAN FRANCISCO CA 94111-3305 |
| RON BENDER<br>LEVENE NEALE BENDER RANKIN & BRILL LLP<br>1801 AVENUE OF THE STARS STE 1120<br>LOS ANGELES CA 90067 | NANETTE DUMAS<br>OFFICE OF THE UNITED STATES TRUSTEE<br>280 SOUTH FIRST ST SUITE 268<br>SAN JOSE CA 95113-0002 |
| K JOHN SHAFFER<br>STUTMAN TRIESTER & GLATT PC<br>1901 AVENUE OF THE STARS 12TH FL<br>LOS ANGELES CA 90067 | HENRY KEVANE<br>PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP<br>150 CALIFORNIA STREET 15TH FLOOR<br>SAN FRANCISCO CA 94111-4500 |
| BRUCE BENNETT<br>HENNIGAN BENNETT & DORMAN LLP<br>865 SOUTH FIGUEROA ST SUITE 2900<br>LOS ANGELES CA 90017 | BERNARD BURK<br>HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN<br>3 EMBARCADERO CENTER 7TH FLOOR<br>SAN FRANCISCO CA 94111-4024 |
| PATRICK M COSTELLO<br>BIALSON BERGEN & SCHWAB<br>2600 EL CAMINO REAL SUITE 300<br>PALO ALTO CA 94306 | ROBERT A FRANKLIN<br>MURRAY & MURRAY<br>19400 STEVENS CREEK BLVD SUITE 200<br>CUPERTINO CA 95014-2548 |
| WILLIAM MCGRANE<br>BERNARD S GREENFIELD<br>MCGRANE & GREENFIELD LLP<br>ONE FERRY BUILDING SUITE 220<br>SAN FRANCISCO CA 94111 | SCOTT MCNUTT<br>MCNUTT & LITTENEKER LLP<br>188 THE EMBARCADERO SUITE 800<br>SAN FRANCISCO CA 94105 |
| RICHARD A ROGAN<br>JEFFER MANGELS BUTLER & MARMARO LLP<br>TWO EMBARCADERO CENTER 5TH FL<br>SAN FRANCISCO CA 94111-3824 | |

(Left margin: **UNITED STATES BANKRUPTCY COURT** For The Northern District Of California)

20

**MEMO. DECISION AND ORDER ON TRUSTEE, CONVERSION, DISQUALIFICATION MOTIONS**